STATE OF NEW JERSEY, APPELLANT, v. STATE SUPER-
VISORY EMPLOYEES ASSOCIATION, RESPONDENT.

STATE OF NEW JERSEY, APPELLANT, v. LOCAL 195, IFPTE
AND LOCAL 518, SEIU, RESPONDENTS AND CROSS-AP-
PELLANTS.

Argued May 8, 1978—Decided August 2, 1978.

*Ms. Erminie L. Conley,* Deputy Attorney General, argued the cause for appellant (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Ms. Conley* on the brief).

*Mr. Sidney H. Lehmann,* General Counsel, argued the cause for respondent Public Employment Relations Commission (*Mr. Lehmann* and *Mr. Stephen B. Hunter* on the brief).

*Mr. David I. Fox* argued the cause for respondent, State Supervisory Employees Association (*Messrs. Fox and Fox,* attorneys).

*Mr. Sanford R. Oxfeld* argued the cause for respondents, Local 195, etc. (*Messrs. Rothbard, Harris & Oxfeld,* attorneys).

The opinion of the court was delivered by

PASHMAN, J. These cases involve the question of the permissible scope of collective negotiations concerning the terms and conditions of public employment in this State. At issue is the correctness of the decisions of the Public Employment Relations Commission (PERC) in two scope-of-negotiations determinations rendered pursuant to the New Jersey Employer-Employee Relations Act, L. 1968, c. 303, as amended by L. 1974, c. 123, N. J. S. A. 34:13A–1 et seq. (the Act). Because of the public importance of these questions, both appeals were directly certified by this Court and have also been consolidated. The real point of dispute is the question of the extent, if any, to which the 1974 amendment to N. J. S. A. 34:13A:8.1, L. 1974, c. 123, § 6, expanded the scope of collective negotiation. In short, we must determine whether the amendment signaled an intent by the Legislature to permit negotiation and agreement to supplant Civil Service statutes and regulations. N. J. S. A. 11:1–1 et seq.; N. J. A. C. 4:1–1 et seq. We must also determine whether negotiation of any of the proposals made by the employee organizations is precluded by N. J. Const. (1947), Art. VII, § 1, par. 2, as being inimical to the merit and fitness principles which govern the hiring and promotion of public employees pursuant to that constitutional provision.

## State v. Local 195, IFPTE and Local 518 SEIU

The collective negotiations agreements between the State of New Jersey and Local 195 of the International Federation of Professional and Technical Engineers (IFPTE) and Local 518 of the Service Employees International Union (SEIU) were scheduled to expire on June 30, 1975. During the term of these agreements, large-scale layoffs of employees represented by the Locals had taken place in the Department of Transportation. The Locals were concerned at the lack of job security for the employees and thus sought to negotiate

their seniority rights with regard to layoffs, recall, bumping and reemployment rights. The State refused to negotiate on these matters, contending that they involved managerial policies and were controlled by the Civil Service statutes.

On October 28, 1975 the parties filed a joint petition for a scope-of-negotiations determination with PERC pursuant to *N. J. S. A.* 34:13A–5.4(d). *See N. J. A. C.* 19:13–1.1 *et seq.* The Locals and the State were in general agreement that seniority rights as they related to layoff, recall, bumping and reemployment, constituted terms and conditions of employment. The State argued, however, that regardless of whether the Locals' proposals concerned terms and conditions of employment, they were not subject to negotiation since they concerned managerial responsibilities delineated in the Civil Service statutes, which enactments were said to implement the constitutional "merit and fitness" system embodied in *N. J. Const.* (1947), Art. VII, § 1, par. 2:

> Appointments and promotions in Civil Service of the State, and of such political subdivisions as may be provided by law, shall be made according to merit and fitness to be ascertained, as far as practicable by examination, which as far as practicable, shall be competitive.

The State argued in the alternative that even if not preempted by statute, negotiability of the proposals was still precluded since they concerned "managerial prerogatives" on matters of basic personnel policy.

The fundamental dispute before PERC centered around the various interpretations to be given to the amendments to the Act contained in *L.* 1974, *c.* 123, particularly *N. J. S. A.* 34:13A–8.1. In the original Act, *L.* 1968, *c.* 303, this section effectively limited the scope of collective negotiations by clearly stating that no provision of the Act could "annul or modify any statute or statutes of this State." In *Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n,* 64 *N. J.* 17, 31 ,(1973), we held that the Legislature's use of this strong qualifying language "clearly precluded any expansive approach" to the

negotiability of the terms and conditions of public employment. The 1974 amendment to that section, *L.* 1974, *c.* 123, § 6, changed the wording of *N. J. S. A.* 34:13A–8.1 to its present form, "nor shall any provision hereof annul or modify any pension statute or statutes of this State."

The Locals argued that the 1974 amendment was a legislative response to *Dunellen, supra,* and was intended to broaden the scope of mandatory negotiation to include all terms and conditions of public employment except those covered by pension statutes. The State contended that the amendment's only effect was to make the pension laws sacrosanct and fully immune from any negotiated modifications. The State did not believe that the amendments had any effect on the *Dunellen* rule, which precluded negotiation on matters of governmental policy or on those terms and conditions of employment covered by any statutory scheme.

PERC did not wholly accept either of these viewpoints. It held that the 1974 amendment to *N. J. S. A.* 34:13A–8.1 was not intended "to permit the parties, under any circumstances — even by mutual agreement — to annul or modify existing statutes relative to terms and conditions of employment." *In re Local 195, IFPTE and Local 518, SEIU and State of New Jersey,* PERC No. 77–57, 3 *NJPER* 118, 121 (1977). However, PERC found that the amendments did work a limited expansion of the scope of collective negotiations:

Thus, the change in *N. J. S. A.* 34:13A–8.1 means that general statutes giving authority to employers are not to be read as shields to the employer's obligation to negotiate regarding terms and conditions of employment, but specific statutes governing terms and conditions of employment cannot be abrogated by collective negotiations.

The parties herein therefore are required to negotiate seniority as it relates to layoffs, recall, bumping and reemployment but in doing so must not exceed maximums or fall below minimums provided by statute or in any other manner agree to contravene specific statutory requirements as provided for in Title 11 or any other Title. [3 *NJPER* at 121]

PERC also held that the constitutionally-required merit and fitness system, *N. J. Const.* (1947), Art. VII, § 1, para. 2, *supra,* applies only to appointments and promotions. Thus, in its view, negotiations on layoffs and reemployment would not contravene the constitutional mandate. PERC further concluded that even if that constitutional provision was applicable, increased seniority rights would not be inconsistent with merit and fitness principles.

Finally, PERC held that *N. J. S. A.* 34:13A–5.3, which preserves the rights of public employees under the Civil Service laws and regulations, related solely to the employees' procdural rights of appeal to the Civil Service Commission. That section was not construed to be a bar to negotiations.

PERC's order required the State to negotiate in good faith concerning seniority as it relates to layoffs, recall, bumping and reemployment rights. Both the State and the Locals appealed this determination to the Appellate Division. Thereafter, the State filed a motion for direct certification and for consolidation with the then pending consolidated appeals in *Englewood Teachers Ass'n v. Englewood Ed. Ass'n,* 75 *N. J.* 525 (1978), and *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.,* 78 *N. J.* 144 (1978). The motion for direct certification was granted and that for consolidation denied. 76 *N. J.* 231 (1978).

### *State v. State Supervisory Employees Association*

The other appeal before this Court concerns many matters whose negotiability is in dispute. During collective negotiations between the State Supervisory Employees Association [the Association] and the State of New Jersey, the Association submitted the following negotiating proposals:

1. An employee be eligible for examinations to which he would otherwise be eligible had he not been demoted or involuntarily transferred during two years following the demotion or involuntary transfer.

2. The Department of Civil Service recognizes total State service as the single criteria for layoff.

3. Each employee to be affected by a layoff shall be given individually a forty-five day notice in advance of such action which notice shall specify the effective date of the layoff action.

4. The State negotiate in good faith on the elements of the Civil Service promotional and open competitive examination process:

a. Employees shall be appointed in the order in which they are listed on a promotional listing, veterans' preference excepted.

b. No listing of employees shall be considered incomplete by virtue of there being fewer than three employees on the list.

c. Provisional appointments shall be made from permanent employees in the next lower title in the class series or, if there is no eligible employee there, from the next lower title in the class series.

d. Promotional examinations must be administered within ninety (90) days of the provisional appointment of an employee.

e. The scope of eligibility for a promotional examination shall be extended by stages to the entire State, if necessary, before the Department of Civil Service shall determine that an open competitive examination is appropriate.

5. Employees in variant titles shall be considered to be in the title appropriate to the variation for purposes of layoff actions.

6. The Department of Civil Service shall publish the total score and all the elements of the total score for all promotional examinations.

7. The State shall eliminate any employee rating other than "satisfactory" or "unsatisfactory."

The State refused to negotiate these proposals. It contended that such matters concern fundamental managerial policies entrusted by the Legislature to the Civil Service Commission.

The parties filed a joint petition with PERC for a scope-of-negotiations determination. PERC noted that the State's position was essentially the same as that it had advanced in *Local 195, IFPTE and Local 518, SEIU, supra,* and that the Association's position was closely aligned with that of the Locals in the other case. PERC reaffirmed its decision in the earlier case and held that "[t]he instant parties will be required to negotiate regarding terms and conditions of employment within the framework of the lawful authority of the public employer." *State Supervisory Employees Association and State of New Jersey,* PERC No. 77–67, 3 *NJPER* 138, 141 (1977). However, PERC made it clear that while

negotiations may include subjects within the statutory authority of the public employer, the parties may not agree to contravene or modify the terms of those statutes. *Id.*

PERC held that all of the Association's proposals, except 4(d) and 7, involved terms and conditions of employment and were thus mandatory subjects of negotiation. Since PERC found that 4(d) and 7 did not involve terms and conditions of employment, those items were not held to be mandatorily negotiable. However, PERC added that the parties "may" negotiate these proposals if they wish, but that the Association could not insist on negotiating those two items to the point of impasse.[1]

The State was ordered to negotiate those proposals which PERC had held to be mandatorily negotiable. The State appealed this determination to the Appellate Division and subsequently filed a motion for direct certification of the appeal and consolidation with the appeal in *State v. Local 195, IFPTE and Local 518, SEIU*. At the same time, the State moved before this Court to have the above appeals consolidated with the appeals in *Englewood Teachers Ass'n v. Englewood Ed. Ass'n, supra,* and *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed., supra.*

This Court granted the State's motion for direct certification, but denied its motion for consolidation. 76 *N. J.* 231 (1978).

## I

### *The 1974 Amendments to the Act*

The passage of the New Jersey Employer-Employee Relations Act, *L.* 1968, *c.* 303, represented a milestone in public employment labor relations in this State. The Legislature

---

[1] The existence of a class of subjects as to which collective negotiation is "permissive" rather than mandatory is addressed in our decision today in *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed., supra.*

created a Public Employment Relations Commission to "[m]ake policy and establish rules and regulations concerning employer-employee relations in public employment relating to dispute settlement, grievance procedures and administration, including enforcement of statutory provisions concerning representative elections and related matters." *N. J. S. A.* 34:13A–5.2. Public employees were extended rights of collective representation more nearly approximating those enjoyed by private sector employees than had been the case when their sole source of organizational rights was *N. J. Const.* (1947), Art. I, para. 19.

The scope of collective negotiation, however, was limited by the fact that the Act, by its express terms, authorized such negotiation only with respect to the terms and conditions of public employment. *N. J. S. A.* 34:13A–5.3. The Act did not provide a definition of terms and conditions of employment. Moreover, the original version of *N. J. S. A.* 34:13A–8.1 further restricted the reach of collective negotiation:

Nothing in this act shall be construed to annul or modify, or to preclude the renewal or continuation of any agreement during its current term heretofore entered into between any public employer and any employee organization, *nor shall any provision hereof annul or modify any statute or statutes of this state.* (emphasis added)

This Court first confronted the issue of the permissible scope of collective negotiation in *Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n, supra,* where we held that

* * * to the extent that it could fairly be accomplished without any significant interference with management's educational responsibilities, the local boards of education would have the statutory responsibility of negotiating in good faith with representatives of their employees with respect to those matters which intimately and directly affect the work and welfare of their employees.

[64 *N. J.* at 25]

The *Dunellen* definition of the scope of mandatory negotiability was further refined in *Bd. of Ed. of Englewood v.*

*Englewood Teachers,* 64 *N. J.* 1, 7 (1973), where we held that

* * * major educational policies which indirectly affect the working conditions of the teachers remain exclusively with the Board and are not negotiable whereas items which are not predominantly educational policies and directly affect the financial and personal welfare of the teachers do not remain exclusively with the Board and are negotiable.

Thus, negotiable terms and conditions of employment are those matters which intimately and directly affect the work and welfare of public employees and on which negotiated agreement would not significantly interfere with the exercise of inherent management prerogatives pertaining to the determination of governmental policy. *See Burlington Cty. Col. Fac. Ass'n v. Bd. of Trustees,* 64 *N. J.* 10, 14 (1973) ; *Lullo v. Intern. Ass'n of Fire Fighters,* 55 *N. J.* 409, 440 (1970). In *Englewood, supra,* we indicated that working hours, compensation, physical arrangements and facilities and customary fringe benefits were the essential components of terms and conditions of employment. 64 *N. J.* at 6–7.

In *Dunellen,* we contemplated the existence of two categories of negotiating matters — those mandatorily negotiable as terms and conditions of employment and those which were left to managerial discretion and were thus non-negotiable. 64 *N. J.* at 25. A further limitation on the negotiability of matters which qualified as terms and conditions of employment under *Dunellen* was the wording of the last clause in *N. J. S. A.* 34:13A–8.1. Even proposals concerning terms and conditions of employment were not negotiable under the Act if agreement thereon would contravene any other statute.

Employee groups were greatly dissatisfied with these limitations on negotiability. That dissatisfaction manifested itself in pressure upon the Legislature to expand the area of collective negotiation created by the Act. In 1974 the Legislature amended the Act. The two provisions with which

we are primarily concerned are *N. J. S. A.* 34:13A–5.3 and *N. J. S. A.* 34:13A–8.1. The former section had the following sentence added to it:

Notwithstanding any procedures for the resolution of disputes, controversies or grievances established by any other statute, grievance procedures established by agreement between the public employer and the representative organization shall be utilized for any dispute covered by the terms of such agreement.

[*L.* 1974, *c.* 123, § 4]

This particular language was from the initial amendment proposal of April 16, 1974, S. 1087, and was passed unchanged. However, the proposed amendment to *N. J. S. A.* 34:13A–8.1 underwent several changes. The first version of S. 1087 proposed deletion of the words "nor shall any provision hereof annul or modify any statute or statutes of the State" and would have replaced it with:

Nothing in this act shall be construed to annul the duty, responsibility or authority vested by statute in any public employer or public body except that the impact on terms and conditions of employment of a public employer's or a public body's decisions in the exercise of that duty, responsibility or authority shall be within the scope of collective negotiations.

[S. 1087, p. 9, lines 8–13]

The Sponsor's Statement to S. 1087 indicated that the purpose of this section, § 6, was to "clarify the scope of negotiations" in response to *Dunellen's* request for such a legislative statement.[2]

---

[2]The full text of the Sponsors' Statement follows:
It is the purpose of sections 4 and 6 of this bill to clarify the scope of negotiations between public employers and employee organizations. The importance of some clarification was emphasized by the Supreme Court in *Burlington County College Faculty Association v. Board of Trustees, Burlington County College,* 64 *N. J.* 10, *supra* and in *Dunellen Board of Education v. Dunellen Education Association,* 64 *N. J.* 17, *supra.* The clarification set out in section 4 of this act is for the purpose of resolving the tension

The Sponsors' Statement regarding § 4 of S. 1087, which amended *N. J. S. A.* 34:13A–5.3, is theoretically valuable to this Court in interpreting the 1974 amendment to that section. As we held in *Deaney v. Linen Thread Co.,* 19 *N. J.* 578, 584-585 (1955), where the Court adopted Justice Jacobs' view as stated in his concurrence in *Board of National Missions v. Neeld,* 9 *N. J.* 349, 361 (1952):

The introducer's statement clearly constitutes relevant evidence on any proper issue as to the legislative purpose, meaning or intent; it sets forth the interpretation of the draftsman or sponsor of the legislation, is circulated amongst his fellow members of the Senate or Assembly, as the case may be, and becomes a matter of record available for inspection by all, then and thereafter. It may be very complete and embody a fully documented narrative of purpose entitled to substantial consideration. See *e. g.,* Assembly No. 15 introduced on March 21, 1952, and bearing a statement which is in form comparable to a detailed committee report. On the other hand it may be inadequate and perhaps misleading and entitled to little consideration.

Since the Legislature passed unchanged the sponsors' version of § 4, we may assume that it generally concurred with

which exists between statutory provisions for the settlement of controversies and disputes which preceded the enactment of the Employer-Employee Relations Act and the existence of contractual procedures for the resolution of grievances arising under a collective agreement, including provisions for binding arbitration. Under the addition to section 4 of this act, an employee organization may negotiate and utilize procedures for the resolution of grievances, and both parties may arbitrate disputes within the definition of "grievance" in their collective negotiation agreement. Section 6 is intended to give greater guidance to PERC and to the courts in making the determination whether a particular issue is within the scope of negotiations. Section 6 provides that guidance without enacting a list of negotiable subjects. Questions concerning the scope of negotiations will still be resolved on a case-by-case basis, but both the administrative agency charged with enforcing this act and the courts will be aided by the statutory standard that the impact on terms and conditions of employment of the exercise of statutory duties by a public employer is negotiable.

[Senate No. 1087]

their view of what that section was intended to accomplish. However, the proposed § 6 of S. 1087, which would have amended *N. J. S. A.* 34:13A–8.1, was completely changed several times prior to passage. This fact renders the Sponsors' Statement a less than definitive guide to the intended effect of the amendment of that section as it finally emerged. Thus, far less deference is to be accorded to any observations of the sponsors of S. 1087 with respect to the meaning and purpose of § 6 than with respect to § 4.

On May 7, 1974 a joint public hearing was held before the Senate Conference and Coordinating Committee and the Assembly Labor Committee. Two days later § 6 was amended so that it provided a list of non-negotiable management rights:

It is the right of any public employer to determine the standards of services to be offered; determine school and college curricula; determine the standards of selection for employment; direct its employees; take disciplinary action; maintain the efficiency of operations; determine the methods, means and personnel by which operations are to be conducted; determine the content of job classifications; take all necessary actions to carry out its mission in emergencies; and exercise complete control and discretion over its organization and the technology of performing its work. Decisions of any public employer on the aforesaid matters are not within the scope of collective negotiations; provided, however, that questions concerning the practical impact that decisions on said matters have on employees, such as questions of workload or manning, are within the scope of collective negotiations.

[Amended version of *N. J. S. A.* 34:13A–8.1 reported on May 9, 1974]

On June 7, 1974, Senator Dodd submitted a written "Report to the Senate:. My Objections and Alternatives to S. 1087." He criticized the removal of the language "nor shall any provision hereof annul or modify any statute or statutes of this State" as greatly expanding the scope of bargaining. Senator Dodd cautioned that the amendment "suggests a direct legislative intent to eliminate all terms and conditions of employment from State regulation and

control." *Dodd Report, supra,* at 4–6. He specifically mentioned, as an example, the possibility that public employees would demand to bargain about pensions. *Id.,* at 5. The Senator saw a need to relinquish control in some areas, but emphasized a need to maintain control in others. The problem with S. 1087 was that it purported to remove every protection of existing law.

On June 17, 1974, the day the bill was voted on in the Senate, this section was again amended. The entire language of the May 9 version was deleted and the single word "pension" was added to the last sentence of the *L.* 1968, *c.* 303 version. It now read, "nor shall any provision hereof annul or modify any pension statute or statutes of this state." The bill then passed 27–11 and moved into the Assembly.

Several amendments to the Senate version were proposed in the Assembly. The most significant one was introduced by Assemblyman Burstein on September 30, 1974. It would have deleted the word pension from the amended version of *N. J. S. A.* 34:13A–8.1, thus leaving that section essentially unchanged from its *L.* 1968, *c.* 303, form. This proposal caused heated debate. The vote on it was 35–35, insufficient to carry the measure. On October 7, 1974, the present version of *N. J. S. A.* 34:13A–1 *et seq.* passed the Assembly by a 58–14 margin. Several amendments not germane to the instant case had been added. On October 21, 1974, the Senate approved the amended version by a vote of 28–8. Governor Byrne signed the bill that very day, and *L.* 1974, *c.* 123 became effective 90 days later.

On the same day that S. 1087 was finally enacted, a companion bill (A.814) was approved as Chapter 124 of the Laws of 1974. Under Chapter 124, the Public Employer-Employee Relations Study Commission was created to study and analyze the Employer-Employee Relations Act as amended and supplemented, and to propose any changes which it deemed necessary to enhance the statute's effectiveness. Specifically mentioned in *L.* 1974, *c.* 124 is the fact that this Court has been compelled to interpret vague and

imprecise parts of present law. Thus, while the Legislature passed the 1974 amendments to the Act, it simultaneously commissioned a study of its provisions for possible further amendment.

The public hearings and other work of the Study Commission culminated in a written "Report to the Governor and the Legislature" dated February 2, 1976. This report concluded that "[i]t is not clear which issues are bargainable and which are matters of educational policy to be determined by administrators or elected officials." *Study Report* at 54. The same conclusion is applicable with respect to management policy in other areas of government employment. The *Study Report* also concluded that negotiability should continue to be decided on a case by case basis. Finally, it recommended that another such study commission should be established to examine and clarify the relationships between the other statutes with the PERC law where there is apparent overlap and conflict. The Legislature has continued to grapple with this problem, but no further enactments have emerged.

There are three schools of thought concerning the significance of the addition of the word pension to *N. J. S. A.* 34:13A–8.1. Each proposed interpretation will be discussed in detail.

## A.

PERC's view, and that of the State Supervisory Employees Association, is that while proposals concerning terms and conditions of employment are mandatorily negotiable, the parties may agree only to contractual terms which are within the minima and maxima set by specific statutes. PERC refuses to sanction negotiation of subjects on which the parties' agreement might contravene a specific statute, noting that "[t]he courts have held that when the literal reading of a statute such as the amendment to *N. J. S. A.* 34:13A–8.1 leads to an absurd result, * * * a reasonable construction

consistent with its underlying purposes is presumed." *Local 195, supra,* 3 *NJPER* at 121. PERC concluded that such a construction would impliedly repeal a number of statutes which set maxima and minima or absolutes concerning terms and conditions of public employment. PERC is not willing to permit public employers to agree to any terms which would contravene a specific statutory imperative. PERC has decided that the scope of negotiations under *N. J. S. A.* 34:13A–8.1 is not that expansive and that it is effectively limited by the lawful authority of the public employer to determine or recommend employment policy. Moreover, PERC conceives its role to be that of harmonizing the Employer-Employee Relations Act with the Civil Service statutes in such a way that each scheme suffers minimal disruption.

The case of *In re Byram Tp. Bd. of Ed.,* 152 *N. J. Super.* 12 (App. Div. 1977), is illustrative of PERC's approach. The court there noted that

We do not believe, as does the Association, that the 1974 amendments rendered obsolete the *Dunellen* trilogy (*Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n, supra; Englewood Bd. of Ed. v. Englewood Teachers,* 64 *N. J.* 1 (1973) ; *Burlington Cty. College Fac. Ass'n v. Bd. of Trustees,* 64 *N. J.* 10 (1973). The amendments, in our view, do not reflect a legislative design to deprive boards of education of their exclusive managerial prerogative in matters involving predominantly educational policies. We do not think that the Legislature intended such result by deleting from *N. J. S. A.* 34:13A–8.1 the provision that nothing in the act should be construed to annul or modify "any statute or statutes of this State", and substituting the words "nor shall any provision hereof annul or modify any pension statute or statutes of this State." Whether or to what extent the change in wording may affect specific provisions in *Title* 18A which appear to be in conflict with the New Jersey Employer-Employee Relations act is a complex issue which need not be resolved in this appeal and should be left for another day.

Since the phrase "terms and conditions" remains undefined in the statute, the *Dunellen* standard, in our view, retains its fundamental vitality.

[152 *N. J. Super.* at 21–22 (citations omitted)]

*Byram* also provides a useful example of how this approach works in practice. One matter determined to be mandatorily negotiable was a proposal by the employee organization therein that special area teachers have no more than three hours of contact with pupils per day. The court agreed with PERC's conclusion that this proposal dealt with teacher work loads, which is a term and condition of employment. 152 *N. J. Super.* at 26. However, the court hastened to add that "* * * with respect to special area teachers, the proposal is not to be construed as reducing the total daily employment time of such teachers below four clock hours, the minimum required by *N. J. A. C.* 6:3–1.13 for full employment of teachers." *Id.*[3] Thus, if the contract called for a daily schedule of three clock hours of student-teacher interaction, at least one clock hour more of education related duties would be required if these area teachers desired to be recognized as and reimbursed as full time teachers.

The advantage to this approach is that where terms and conditions of public employment are set by specific statutes, the somewhat odd spectacle of some state employee groups having different rules governing their employment from other similar groups would be avoided. Presumably, if the Legislature intended varied terms and conditions of employment for different employee groups to exist, it would not have enacted specific statutes nor permitted the Civil Service Commission to promulgate specific regulations which apply on a statewide basis. Moreover, repeals by implication have always been disfavored in this state. When the Legislature intends to drastically alter a prior law or policy, it must do so by a deliberate expression rather than by implication.

---

[3]*N. J. A. C.* 6:3–1.13 is bottomed upon *N. J. S. A.* 18A:29–6 to 29–16, and reads as follows:

Full-time employment of teachers

The period of time in each day required for full-time employment shall be the number of hours prescribed by the local board of education, but shall not be less than four clock hours.

*Delaware River and Bay Auth. v. Intl. Org., etc.,* 45 *N. J.* 138, 148 (1965); *see Loboda v. Clark Tp.,* 40 *N. J.* 424, 435 (1963) citing *Henninger v. Bd. of Chosen Freeholders of Bergen Cty.,* 3 *N. J.* 68, 71 (1949); *Goff v. Hunt,* 6 *N. J.* 600, 606 (1951). An expansive view of negotiability would effectively limit the applicability of these statutes to those instances where public employer and employees did not set any contrary terms and conditions of employment in a collective agreement, or did not cover a particular matter at all therein. PERC rejects this view.

*B*

The State contends that *L.* 1974, *c.* 123 had no effect whatsoever on the *Dunellen* trilogy. Much is made of Justice Jacobs' comment in *Burlington Cty. Col. Fac. Assoc. v. Bd. of Trustees,* 64 *N. J.* 10, 16 (1973) that educational policy matters would not be negotiable unless the Legislature expressed such a desire in "clear and distinct phraseology." The State contends that the 1974 amendments did not define terms and conditions of employment and did not specify that an enlarged sphere of negotiations was contemplated. The lack of anything even approaching "clear and distinct phraseology" is also cited as evidence that the Legislature agreed with *Dunellen* on the issue of what is negotiable. The State ascribes little significance to the addition of the word "pension" in *N. J. S. A.* 34:13A–8.1. That action is interpreted to mean that while the Legislature could not agree on anything else, there was a consensus that pension statutes were not proper subjects of negotiation. As to all other matters, there was no agreement, meaning that by its inaction the Legislature acquiesced in the *Dunellen* decision. *Cf. Lemke v. Bailey,* 41 *N. J.* 295, 301 (1963); *Egan v. Erie R. Co.,* 29 *N. J.* 243, 250 (1959); *Asbury Park Press v. City of Asbury Park,* 19 *N. J.* 183, 190 (1955).

This construction has the advantage of simplicity. In adopting it, we would be holding that *L.* 1974, *c.* 123 meant

essentially nothing. However, the vote in the Assembly on
the amendment to delete the addition of the word "pension"
to *N. J. S. A.* 34:13A–8.1 was 35–35. It is unlikely that
the legislators would be so divided over a meaningless change.
Moreover, carried to its logical extreme, the State's position
would render most terms and conditions of employment non-
negotiable. For example, a literal application of *N. J. S. A.*
11:5–1(f) would all but emasculate the Employer-Employee
Relations Act. That section directs the Civil Service Com-
mission to

Establish procedures for maintaining adequate employer-employee
relations, and for the orderly consideration of disputes, grievances,
complaints and proposals relating to the employer-employee relation-
ship, in the classified service of the State; and make investigations,
conduct hearings and make rulings with respect thereto. Such rul-
ings shall not be interpreted to compel or require the expenditure
of moneys which are not available or the incurring of obligations
not otherwise authorized by law.

We cannot accept the proposition that the Legislature went
through the trouble of establishing PERC through *L.* 1968,
*c.* 303 and then decided that a general statute such as *N. J.
S. A.* 11:5–1(f) would automatically preclude the negotiability
of all items within its scope. If that were the case, there
would be no need for PERC or for collective negotiations con-
cerning the terms and conditions of employment in the
classified State service. Attributing such an intent to the
Legislature is at best unrealistic.

Finally, we reject the State's argument that *N. J. Const.*
(1947), Art. VII, § 1, par. 2, see *ante* at 61–62, precludes ne-
gotiation and agreement concerning the matters brought out
in these cases. The State submits that this provision was in-
tended to render the whole Civil Service scheme a part of
this constitutional command. Rather than according that
paragraph such sweeping scope, we prefer to interpret it in
a more literal fashion so that it provides that appointments
and promotions must be based on merit and fitness. So long
as terms and conditions of reemployment and layoffs are

not at odds with merit and fitness, we discern no constitutional obstacle to giving effect to appropriate provisions of collectively negotiated agreements.

## C

The most expansive interpretation of the effect of *L.* 1974, *c.* 123 is that offered by Locals 195 and 518. They assert that, as to terms and conditions of employment, the legislative intent was to preclude only negotiation concerning matters covered by pension statutes; in their view everything else is negotiable. They contend that the Legislature was responding to our holding in *Dunellen, supra,* see *ante* at 61, that the 1968 version of *N. J. S. A.* 34:13A–8.1 "clearly precluded an expansive approach" to negotiation. The transcript of the May 7, 1974 hearing of the joint committee of the Legislature is cited in support of this construction. At that hearing the labor relations counsel for the New Jersey State League of Municipalities indicated to Senator Greenberg that S. 1087 would effectively overrule *Dunellen.*[4] Also noted is the accompanying statement to the final effort to amend S. 1087 by removing the word "pension."[5] The Locals

---

[4] The topic of discussion at the session was the original version of *N. J. S. A.* 34:13A–8.1 in S. 1087 (*ante* at 68). This version, of course, was never enacted. However, its sweep seems, on its face, to be less than that of the enacted version. The statement of counsel regarding the effect of S. 1087 on *Dunellen* is found on page 80 of the transcript of the Public Hearing Before Senate Conference and Coordinating Committee and Assembly Labor Committee on Senate Bill No. 1087.

[5] *S–1087 Nullifies Previously Enacted Statutes*
S–1087, as amended and passed by the senate, provides on page nine, lines 3 through 9, as follows: "Nothing in this Act shall be construed to annul or modify, or preclude the continuation of any agreement during its current term heretofore entered into between any public employer and any employee organization, nor shall any provision hereof annul or modify any pension statute or statutes of this State." According to a normal legislative interpretation, all previous statutory enactments other than those concerning

have concluded that all parties knew the implication of the insertion of the word pension at the time of the vote, and that this Court should thus give effect to the literal language of the statute as amended.

This approach is the most faithful to the literal text of the amendment. It also represents the most radical departure from the earlier scheme. One might reasonably believe that had the Legislature determined to permit specific Civil Service statutes to be contravened by collective negotiation, it would have said so with greater clarity.

If adopted, this approach would give wide sway to collective negotiations. While the employees could press for greater rights in one area than are presently permitted by statute, the State would be free to demand concessions concerning some of the rights presently guaranteed employees by statute

pensions are hereinafter subservient to the provisions of Chapter 303 as amended. The affect of this change in language is a 180 degree reversal of prior public policy, which currently provides that Chapter 303 shall not annul or modify any previous statutory amendment.

By providing that Chapter 303, as amended by S–1087, supersedes all other statutory enactments, collective bargaining agreements negotiated pursuant to its provisions would no longer be subject to other statutory schemes. Hereafter, collective negotiations would not be limited solely to terms and conditions of employment, but would encompass all other administrative and policy matters except those concerning pensions.

We believe that the legislature, in its wisdom, has appropriately enacted expansive statutory schemes in both the areas of Education [18A] and Municipal Law [Titles 40 and 40A]. Many of the topics covered in those legislative schemes may be appropriate for negotiations. However, most of the matters covered in those statutes are clearly the sole prerogative and obligation of the state legislature. If the legislature is to protect the citizens of the State of New Jersey from serious fiscal and operational difficulties throughout all levels of government in the State, it cannot relinquish its control over the areas which are presently regulated by statute. For to do any less, the legislature must be prepared to permit every local government unit and employee representative to "write their own State Laws for their own particular circumstances."

in exchange. This system would most nearly approximate collective bargaining in the private sector.

The most significant problem with this interpretation is that it would permit total diversity in the terms and conditions of employment for each public employee negotiating unit in the State. Matters now governed by specific statute would be regulated only by the negotiated agreement of the public employer and the majority representative. Civil Service statutes and regulations could be abrogated entirely if the parties so agreed. Areas where state-wide uniformity has been deemed a necessity would simply break down into a mass of confusion.

*D*

The 1974 amendment to *N. J. S. A.* 34:13A–8.1 is ambiguous and the legislative intent is less than clear. However, of the three possible interpretations of the amendment, we find that PERC's approach comports most closely to the intention of the Legislature. If the insertion of the word pension in *N. J. S. A.* 34:13A–8.1 was not of considerable significance, the reason for the protracted struggle in the Legislature would be difficult to fathom. Yet, the expansive interpretation called for by Local 195 and Local 518 would signal a revolutionary change in government direction. While we do not doubt that the Legislature has the power to ordain that collective negotiations may contravene specific as well as general statutes, we will await the "clear and distinct phraseology" which we called for in *Burlington, supra,* 64 *N. J.* at 16, before so interpreting the amended Act.

Initially, we note our agreement with PERC that negotiated agreement with respect to matters beyond the lawful authority of the public employer is impermissible. A binding agreement concerning matters whose regulation the Legislature has chosen to place outside the control of a public employer would not be within the employer's power. A public employer may not agree to a contractual provision

which purports to bind the administrative discretion of the Civil Service Commission. Furthermore, we affirm PERC's determination that specific statutes or regulations which expressly set particular terms and conditions of employment, as defined in *Dunellen,* for public employees may not be contravened by negotiated agreement. For that reason, negotiation over matters so set by statutes or regulations is not permissible. We use the word "set" to refer to statutory or regulatory provisions which speak in the imperative and leave nothing to the discretion of the public employer. All such statutes and regulations which are applicable to the employees who comprise a particular unit are effectively incorporated by reference as terms of any collective agreement covering that unit.[6]

Yet, the 1974 amendment to *N. J. S. A.* 34:13A–8.1 was not an empty gesture. Under *Dunellen,* terms and conditions of public employment whose regulation was entrusted to the Civil Service Commission by general statutes were not negotiable even though the Commission had not promulgated any rule governing a particular matter. Under the amended version of *N. J. S. A.* 34:13A–8.1, such a general statute will not preclude mandatory negotiation over

---

[6]A significant exception to our holding that terms and conditions of employment set by statute are not subject to negotiated modification involves statutes which provide for dispute-resolutions mechanisms for particular types of employee complaints. To the extent these statutes may be viewed as setting specific terms and conditions of employment, the Legislature has expressly sanctioned deviation from those statutory procedures by providing in the 1974 amendment to *N. J. S. A.* 34:13A–5.3, see *ante* at 67–68, that they shall be superseded by the grievance procedure negotiated between the parties for the resolution of disputes concerning the terms and conditions of public employment.

For the same reason, these particular types of statutes may not be considered as implicit terms of any collective agreement covering employees to whom the statutory dispute resolution procedures would be available. The parties are, of course, free to expressly adopt the statutory mechanisms as their contractual grievance procedure if they so choose.

particular terms and conditions of employment as to which the Civil Service Commission could have but has not enacted preemptive regulations. There are many areas in which the Commission has not sought to comprehensively regulate the terms and conditions of public employment. The Legislature has determined that collective negotiation concerning such nonregulated terms and conditions of public employment. The Legislature has determined that collective negotiation concerning such nonregulated terms and conditions of public employment should be mandatory and any negotiated agreement thereon valid. It must be emphasized, however, that the adoption of any specific *statute* or *regulation* setting or controlling a particular term or condition of employment will preempt any inconsistent provision of a negotiated agreement governing that previously unregulated matter. In short, the parties must negotiate upon and are free to agree to proposals governing any terms and conditions of public employment which have not been set, and thus preempted, by specific statutes or regulations.

It is implicit in the foregoing that statutes or regulations concerning terms and conditions of public employment which do not speak in the imperative, but rather permit a public employer to exercise a certain measure of discretion, have only a limited preemptive effect on collective negotiation and agreement. Thus, where a statute or regulation mandates a minimum level of rights or benefits for public employees but does not bar the public employer from choosing to afford them greater protection, proposals by the employees to obtain that greater protection in a negotiated agreement are mandatorily negotiable. A contractual provision affording the employees rights or benefits in excess of that required by statute or regulation is valid and enforceable. However, where a statute or regulation sets a maximum level of rights or benefits for employees on a particular term and condition of employment, no proposal to affect that

maximum is negotiable nor would any contractual provision purporting to do so be enforceable.[7] Where a statute sets both a maximum and a minimum level of employee rights or benefits, mandatory negotiation is required concerning any proposal for a level of protection fitting between and including such maximum and minimum.

Our holding is consistent with the current understanding and actual practices of those involved in the public employment relations field. If the subject matter is covered by a specific Civil Service regulation and the parties are dissatisfied, their recourse is to seek a modification of such regulation through the administrative process. Indeed, they may even petition the Legislature where a particular term and condition of employment is controlled by a statute with which they disagree. As a practical matter, Civil Service could be made aware of the course of negotiations so that the parties may anticipate whether its approval of a desired change in regulations could ever be obtained. This would promote labor peace by focusing the concerns of employers

---

[7] In referring to those statutes which contain maxima, we are speaking, for example, of enactments providing that employees may receive "up to" or "not to exceed" a given level of benefits. An example is *N. J. S. A.* 11:13–2, which provides that where service ratings are used to determine layoffs, seniority credits, not to exceed ten points, may be added to the ratings.

Our reference to statutes containing minimum employee rights or benefits relates, for example, to those enactments which provide that employees receive "at least" or "not less than" a certain level of benefits. An example is *N. J. S. A.* 11:26D–1, *post* at 88, which provides a notice of "at least 45 days" be given to an employee in the classified Civil Service before he may be subject to layoff.

Mandatory or imperative statutes ordinarily are those enactments which set up a particular scheme which "shall" be handled as directed. An example of such a statute is *N. J. S. A.* 18A:28–5(b), which provides that teachers "shall be under tenure during good behavior and efficiency and they shall not be dismissed * * * after employment in such district or by such board for * * * three consecutive academic years, together with employment at the beginning of the next succeeding academic year," except for specifically enumerated reasons.

and employees on matters as to which they have the power
to act.

 Our holding permitting negotiation concerning mat-
ters not covered by a specific statute does not apply to pension
statutes. The Legislature has determined that the entire
subject matter of public employee pensions is to be insulated
from negotiated agreement which would contravene or sup-
plement its comprehensive regulation of that area. Public
employees and employee representatives may neither nego-
tiate nor agree upon any proposal which would affect the
sacrosanct subject of employee pensions.

## II

### *The Issues*

 Prior to deciding the negotiability of each item
before us, we feel constrained to make an important pro-
cedural observation. Since the passage of *L.* 1974, *c.* 123,
there has been much confusion over selecting the proper
forum for a scope-of-negotiations determination. The answer
is clear — under *N. J. S. A.* 34:13A–5.4(d) PERC is the
forum for the initial determination of whether a matter in
dispute is within the scope of collective negotiations. PERC's
jurisdiction in this area is primary. *See Bd. of Ed. of Plain-
field v. Plainfield Ed. Ass'n,* 144 *N. J. Super.* 521, 524–525
(App. Div. 1976). *Newark Teachers Union v. Bd. of Ed. of
Newark,* 149 *N. J. Super.* 367, 374–375 (Ch. Div. 1977).
No court of this State is empowered to make this initial
determination. For a party dissatisfied with PERC's conclu-
sion, appellate review of PERC's scope determinations is
specifically provided by *N. J. S. A.* 34:13A–5.4(d). However,
as the Appellate Division in *In re Byram Tp. Bd. of Ed.,
supra,* 152 *N. J. Super.* at 22–24, properly held, the scope
of review is narrow. *See also N. J. S. A.* 34:13A–5.4(f). So
long as PERC's determination adheres to the *Dunellen* guide-
lines, see *ante* at 66, appellate courts should give PERC
the same deference which administrative agencies are nor-

mally accorded in their area of expertise. *See N. J. Guild of Hearing Aid Dispensers v. Long,* 75 N. J. 544, 562–563 (1978).

We next turn to consideration of the proposals whose negotiability is disputed in this appeal and our ruling on each.

A. *Is seniority as it relates to layoffs, recall, bumping and reemployment negotiable?*

This is the sole issue in *Local 195.* We have no doubt that these questions all relate to terms and conditions of employment. Nothing more directly and intimately affects a worker than the fact of whether or not he has a job. Since only those workers whose work is judged satisfactory are included in this proposal, there is no danger of the merit system being injured. However, we have concluded that the negotiability of this proposal is preempted by statute and regulation.

There are several relevant statutes and some regulations in the New Jersey Administrative Code which bear on these issues. *N. J. S. A.* 11:13–2 provides that when service ratings are used to determine layoffs, seniority credits of up to ten points may be added. The regulations promulgated pursuant to this section are found below.

*N. J. A. C.* 4:1–16.3 [Pre-September 8, 1977 version]
Layoff or demotion for all other employees in that class shall be in the inverse order of performance ratings provided that:
1. In computing the performance ratings to determine the order of layoff or demotion, seniority credits to the extent of one point for each of the past five years of service and ½ point for each additional year of service up to ten years shall be added to the average rating for the year preceding the date of layoff or demotion;
2. In the absence of an approved system of performance ratings by the Department of Civil Service, layoff or demotions of permanent employees shall be in the order of seniority in the class, the person or persons last appointed being the first laid off or demoted.
*N. J. A. C.* 4:1–16.3 — Order of layoff or demotion
[effective September 8, 1977]

(a) Whenever there are two or more permanent employees in the class from which layoff, or demotion in lieu of layoff is to be made, employees in that class with an unsatisfactory performance rating for the 12-month period immediately preceding the layoff or demotion shall be the first laid off or demoted.

(b) Layoff or demotion for all other employees in that class shall be as follows:

1. Layoff or demotion of permanent employees shall be in the order of seniority in the class, the person or persons last appointed will be the first laid off or demoted.

2. In all cases where there are employees who are veterans, a disabled veteran or a veteran shall be retained, in that order, in preference to a non-veteran having equal seniority in his or her class.

Reemployment rights are discussed in *N. J. S. A.* 11: 15-9, which states, in pertinent part:

\* \* \* such employee shall, whenever possible, be demoted to some lesser office or position, in the same department, in the regular order of demotion and according to service ratings and/or seniority, and placed therein with the salary or pay attached; and his name shall be placed upon a special re-employment list, which list shall take precedence over all other civil service lists. The chief examiner and secretary, with the approval of the president of the Civil Service Commission, shall determine the lesser office or position to which such employee may be demoted.

Reinstatement rights are covered in *N. J. S. A.* 11:15-10,

Such person shall be entitled to reinstatement at any time thereafter in the same or any comparable office or position of the same nature as that from which he was separated as soon as the opportunity arises. When an office or position of a character the same or comparable to that previously held by such person is to be filled, his name shall be certified from the special re-employment list for appointment.

The Civil Service Commission has promulgated a regulation, *N. J. A. C.* 4:1–16.5(a) intended to implement the statutory provision:

The Chief Examiner and Secretary shall, after receipt of the notice, determine the demotional and reemployment rights of the employee to be laid off or demoted and within a reasonable time not to exceed

45 days notify the employee and the appointing authority of such rights.

PERC's initial determination antedated the September 8, 1977 effective date of the new version of *N. J. A. C.* 4:1–16.3(b). At the present time, it appears that once an employee is certified as satisfactory, performance ratings have no further relevance in determining layoffs. However, in the interest of clarifying the proper scope of negotiation and the legal limits of agreement, we shall examine PERC's reasoning in relation to the pre-September 8, 1977 regulation.

██ PERC held that the Civil Service Commission would unilaterally determine all qualifications and criteria for each job and would determine to which jobs particular employees may be demoted. However, it also found that there was room for negotiation between the State and the Locals concerning the number of seniority credits, up to ten, which could be awarded to employees. If negotiation meant merely discussion, we would agree. However, if negotiation is given its normal meaning, which implies that a valid and enforceable agreement concerning the matters negotiated about could be reached, we must differ with PERC. The pre-September 8, 1977 version of *N. J. A. C.* 4:1–16.3(1) set out a mandatory scheme of seniority credits for those units where performance ratings were used to determine layoff, bumping and reemployment rights. Whatever amount of discussion the parties might engage in on this topic, there was nothing on which they could validly agree. This term and condition of employment was set by Civil Service regulation, pursuant to a statutory mandate. No agreement could do other than copy the existing law. Moreover, the revised regulation also speaks in the imperative. We also conclude that *N. J. S. A.* 11:15–9 and 15–10 set out mandatory procedures in dealing with reemployment and reinstatement rights. Thus, there is nothing upon which the parties could agree concerning these matters, as they are comprehen-

sively regulated by statute and Civil Service rule. PERC's order requiring negotiation of these proposals is reversed.

B. *Issues Raised by the State Supervisory Employees Association.*

These issues are generally of three categories: matters concerning layoffs, Items 2, 3 and 5; those encompassing procedures for promotions, Items 1, 4a, b, c, e and 6; and two items, 4d and 7, which PERC found were not mandatorily negotiable. See *ante* at 63–64. The specific proposals will be addressed in these three categories.

*Layoffs.*

PERC determined that issues 3 and 5 were mandatorily negotiable terms and conditions of employment. The Commission also found that the layoff procedures of item 2 were negotiable within the limits set out in the *Local 195* decision. We shall discuss these issues in order.

*Item 2.* The Department of Civil Service recognizes total State service as the single criterion for layoff.

■ This is not a negotiable item despite the fact that it involves a term and condition of employment. PERC is correct in its observation that *N. J. S. A.* 11:13–2 would not be contravened if the employees' proposal was adopted. However, the new version of *N. J. A. C.* 4:1–16.3(b), see *ante* at 85, has set "seniority in the class" as the relevant standard and no collective agreement may contravene this standard. We do not imply that the parties may not discuss desirable changes in this vein and even go so far as jointly to present recommendations concerning such changes to the Legislature or to the Civil Service Commission. However, it would be wasteful of time and resources to characterize as mandatorily negotiable a proposal on which no legally binding agreement could be made. Whatever discussion in which the parties engage concerning this matter must be outside the sphere of collective negotiation. We accordingly

reverse PERC's determination that this proposal is mandatorily negotiable.

*Item 3.* Each employee to be affected by a layoff shall be given individually a forty-five day notice in advance of such action which notice shall specify the effective date of the layoff action.

While a decision to cut the work force to a certain number unquestionably is a predominantly managerial function, the provision of adequate notice to affected employees is certainly a term and condition of employment. The relevant statute sets a minimum, thus leaving open the possibility of negotiation with the employees to provide for more generous notice:

> No person holding office, position or employment in the classified service of the civil service under this State or under any county, municipality or school district thereof, or any other agency operating under the provisions of subtitle 3 of Title 11 of the Revised Statutes, shall be laid off or separated from such service because of economy or otherwise, and not because of any delinquency or misconduct on his part, nor shall his position or office be abolished until after he shall have first been given *notice in writing*, personally or by certified mail, *of the date upon which he will be laid off* or his services so dispensed with, and the reasons therefor. *The said notice shall be served at least 45 days before the lay-off or abolition becomes effective*, and a copy of the said notice shall also be served upon the Civil Service Commission in the same manner. Upon receiving such notice it shall be the duty of the Chief Examiner and Secretary to forthwith determine the said employee's re-employment or demotional rights of such employee and thereafter promptly notify both the employee and the appointing authority of such determination of re-employment and demotional rights.
>
> [*N. J. S. A.* 11:26D–1 (emphasis added; footnote omitted)]

We note that *N. J. A. C.* 4:1–16.4 provides that with respect to notice pertaining to layoff or demotion, "[s]uch notice shall· be served at least 45 days before the layoff or demotion becomes effective." This is a minimum regulation, not a mandatory one. Since employees· may properly press for

more generous rights, we affirm PERC's order that this item be negotiated, subject to the statutory minimum notice requirements.

*Item 5.* Employees in variant titles shall be considered to be in the title appropriate to the variation for purposes of layoff actions.

PERC contends that this proposal is procedural in nature, relating to the manner and means of determining which individuals are to be laid off once the State has determined that (1) layoffs are required, (2) the extent of the reduction in force necessary and (3) the departments or divisions to be affected. We disagree. This proposal is more than a mere procedural request concerning layoffs. Rather, it goes to the very heart of the determination of which employees should be considered together in one pool for purposes of layoff despite the fact that they hold different jobs and therefore possibly possess different skills.

Even with the limitation imposed by PERC as to the nonnegotiability of layoff decisions resulting from a determination that a particular worker's performance on the job was unsatisfactory, this proposal impinges too far into matters not controlled by a public employer. In essence, the Association's proposal seeks input through negotiation on the issue of whether a variant title, e.g., Personnel Technician, Labor Relations, shall be considered to be in the general title appropriate to the variation, Personnel Technician, for the purposes of layoffs. The Association was concerned because employees in variant titles with little seniority were kept on while employees in closely related general titles with significantly more seniority had lost their jobs due to economic layoffs. These layoffs were apparently made without regard to whether the people in the general title with more seniority had the requisite qualifications for a job in the variant title.

The Association's proposal, properly modified so as to permit negotiation only in those instances where

employees in the general title possess the announced qualifications for jobs in the applicable variant title, would eliminate the potential problem of having persons not qualified for a more specialized job bumping workers who are so qualified. However, it is for the Civil Service Commission to establish relevant employment classifications and to set qualifications for specific job categories in each. *N. J. S. A.* 11:7-1-14. Whether these variant title jobs require the same qualifications for their holders as do jobs in the related general title, such that the holders of all of these jobs should be in the same pool for layoff purposes, is a matter for the Civil Service Commission to decide. Any contrary provision of a negotiated agreement between the public employer and its employees would be null and void, as it would be beyond the authority of the employer. Thus, we reverse PERC's holding that this item is mandatorily negotiable.

*Promotional Procedures*

In dealing with the promotional process, PERC and the Appellate Division have generally followed the view that promotional criteria are not mandatorily negotiable while promotional procedures are so negotiable. *See In re Byram Tp. Bd. of Ed., supra,* 152 *N. J. Super.* at 26-27; *Bd. of Ed., Tp. of No. Bergen v. No. Bergen Fed. Teachers,* 141 *N. J. Super.* 97, 104 (1976).

PERC has gone on to conclude that where a person meets all of the criteria and qualifications established by the employer, he has a legitimate expectation that he will at least be eligible for consideration for promotion. Thus, where the employer's rules restrict the number of concededly qualified persons who may vie for a given promotion, by test or otherwise, PERC believes that the restriction on those qualified persons who are barred from consideration is negotiable. While this broad assumption need not be decided herein, we note our agreement with its general thrust, which is clearly consistent with merit and fitness and does not impinge on any legitimate policy-making powers

of government. Of course, this does not mean that public employers may contract beyond their legal authority by agreeing to proposals which would contravene a statute or regulation or purport to bind the administrative discretion of the Civil Service Commission.

> *Item 1.* An employee be eligible for examinations to which he would otherwise be eligible had he not been demoted or involuntarily transferred during two years following the demotion or involuntary transfer.

■ PERC found this proposal to be mandatorily negotiable, with a caveat that those employees who would benefit by it must be limited to those who have not been demoted or transferred due to unsatisfactory performance on the job. First, we conclude that this item is a term and condition of employment which intimately affects employees and is not inextricably tied to government policy making. Second, we conclude that there exists no specific statute which would preclude negotiation on this issue. The broad delegation of power to the Civil Service Commission to establish qualifications for appointment and promotion within the Civil Service, *N. J. S. A.* 11:6–2(e), does not preclude negotiation on this issue. The other relevant statutory section, *N. J. S. A.* 11:9–2, is also very general.

There are, however, several relevant regulations on the subject. Under *N. J. A. C.* 4:1–8.6(a)(2) an applicant for promotional examination must have been employed after regular appointment in the appropriate class for at least one year immediately preceding the closing date for application. This regulation would seem to preclude negotiation on this proposal. Moreover, *N. J. A. C.* 4:1–15.5(b)(1) directs that

> (b) The rights of an employee who has been transferred involuntarily shall not be adversely affected, but he shall retain no rights in the unit from which he has been transferred except that if he is on a promotional list:

1. His name shall be retained on the promotional eligible list for the unit from which he has been transferred until he has had an opportunity to take a promotional examination in his new unit and the resultant list has been promulgated.

Thus, we conclude that this proposal is not mandatorily negotiable and reverse PERC's contrary ruling. The parties may certainly discuss the present regulation and how it could be improved by expanding the rights of demoted or involuntarily transferred employees. They may seek appropriate administrative relief by attempting to convince the Civil Service Commission to amend the regulations. However, they may not negotiate upon a subject as to which their agreement could have no force or effect.

*Item 4.* The State negotiate in good faith on the elements of the Civil Service promotional and open competitive examination process:

 a. Employees shall be appointed in the order in which they are listed on a promotional listing, veterans' preference excepted.

The State claims that under *In re Byram Tp. Bd. of Ed., supra,* 152 *N. J. Super.* at 27, and *No. Bergen Tp. Bd. of Ed. v. No. Bergen Fed. Teachers, supra,* 141 *N. J. Super.* at 103–104, this proposal would not be considered a term and condition of employment. However, unlike the proposals in those cases, the one herein does not attempt to dictate criteria for arriving at a rating. This is a close question since it does affect the employer's ability to select a promotee based on his view of the relative qualifications of three persons. On balance, however, we find this item to be a term and condition of employment. We agree with PERC's view that since all three pesons who are certified are clearly qualified, this proposal is procedural in nature and does not bear on criteria for promotion. In our view, non-negotiable criteria of promotion deal with qualifications bearing on ability to do the job, as these matters go to the substantive question of the fitness of an employee for a given position.

Our next inquiry is whether or not any statute or regulation would be contravened by permitting negotiation on this issue.

N. J. S. A. 11:10–6 provides that:

The appointing authority shall, in the selection of appointees from an employment list, be entitled to a certification of the names of three eligibles willing to accept appointment for each vacancy as provided by section 11:10–1 of this title, and may select any one of such eligibles whom he considers best qualified to fill the vacancy in question.

Similarly, N. J. S. A. 11:27–4 provides in relevant part and excluding the provisions regarding veterans' preference:

The Civil Service Commission shall certify to the appointing authority the names and addresses of the three candidates willing to accept employment standing highest upon the register for each position to be filled, and such appointing authority shall select one of the three so certified . . . .

Our reading of these statutes leads us to the conclusion that so long as one of three certified candidates is picked, the statute is satisfied. However, it does not necessarily follow that an employer may contract away its discretion to pick any one of the three. In Schroder v. Kiss, 74 N. J. Super. 229, 239 (App. Div. 1962), the court held that the statutory right of employers, guaranteed by N. J. S. A. 11:10–6, to have at least three certified eligibles to choose from is a recognition by the Legislature that examinations are not absolutely predictive of which candidate will be the best qualified to fill the appointing authority's needs. Moreover, we conclude that N. J. S. A. 11:10–6 mandates that employers have the option of choosing the second or third certified person on the list. Thus, it is a specific statute which may not be contravened by an agreement. We therefore reverse PERC's determination that this matter is mandatorily negotiable.

 b. No listing of employees shall be considered incomplete by virtue of there being fewer than three employees on the list.

■ First, we find this proposal to be concerned with procedural aspects of promotion. It does not actually affect those substantive aspects related to merit and fitness. It is thus a term and condition of employment. *N. J. S. A.* 11:10–6 provides that "[t]he appointing authority shall * * * be entitled to a certification of the names of three eligibles." That statute has been implemented by Civil Service Regulation, *N. J. A. C.* 4:1–12.5, which permits the employer, in its discretion, to choose from a list of less than three eligibles or to insist on a full list of three.

> Whenever fewer than three names are certified from a promotion or open competitive employment list, the appointing authority may appoint from such incomplete certification, or may decline to make a permanent appointment from such list until such time as a complete certification of the names of three persons willing to accept the position has been certified.

We discern an intent to permit the employer to make the determination of whether or not a choice from among three employees is desirable. However, we do not believe that *N. J. S. A.* 11:10–6 grants the employer discretion to contract away his right to insist on having three employees from whom to choose. Thus, we reverse PERC's determination that this proposal is mandatorily negotiable.

> c. Provisional appointments shall be made from permanent employees in the next lower title in the class series or, if there is no eligible employee there, from the next lower title in the class series.

■ The proposal involves elements of both terms and conditions of employment and managerial prerogative. However, inasmuch as it attempts to restrict an employer's prerogative to control assignments, it impinges too far into management functions. In *Dunellen, supra,* 64 *N. J.* at 26, we quoted *School District of Seward Ed. Ass'n v. School District of Seward,* 188 *Neb.* 772, 199 *N. W.* 2d 752, 759 (1972), to the effect that the right to maintain order and

efficiency and to control transfers and assignments were managerial prerogatives. Moreover, *N. J. S. A.* 11:10–3 provides that provisional appointments are made when "necessary to prevent the stoppage of public business or inconvenience to the public." However, with the clear proviso that the pool of employees eligible for provisional appointment must be both presently qualified for and immediately available to fill the higher position, we perceive no statutory or regulatory obstacle to negotiated agreement upon this item. The determination as to the need for filling the higher position on a provisional basis remains, of course, within the sole discretion of the public employer. PERC's holding, as modified, is affirmed.

> e. The scope of eligibility for a promotional examination shall be extended by stages to the entire State, if necessary, before the Department of Civil Service shall determine that an open competitive examination is appropriate.

*N. J. A. C.* 4:1–2.1 defines "promotional examination" as "an examination open to permanent employees of a particular class or classes to determine their relative merit and fitness for positions in a higher class." That same regulation defines "open competitive examination" as "an examination open to members of the public who meet and comply with prescribed requirements for admission, to determine their relative merit and fitness for employment."

The issue whether or not this item is a term and condition of employment is another close question in that there is no doubt that while preferred access to promotion intimately and directly affects employees, it might impinge directly on management's duty to hire and promote on the basis of merit. However, we need not reach this issue. Even assuming that this proposal involves a *Dunellen* term and condition of employment, it is still not negotiable. Under *N. J. A. C.* 4:1–8.7 the Department of Civil Service has the authority to determine when open competitive examination is necessary by determining that "* * * it is not con-

sistent with the best interests of the service to fill such a vacancy by promotion for any of the following or other sufficient reasons." Moreover, limiting the situations in which open competitive examinations may be held is not within the power of a public employer.

 It is clear that the Legislature favored promotional tests when practicable and consistent with the best interests of the State. See Flanagan v. Civil Service Dept., 29 N. J. 1, 9 (1959). This is evidenced by N. J. S. A. 11:10–7:

> A vacancy in the higher classes of positions shall be filled, as far as it is consistent with the best interests of the state, by promotion following competitive tests open to those who have served a minimum time established by regulation in the lower class or classes of positions as may be designated.

However, the ultimate decision as to whether open examinations should be given lies within the exclusive discretion of the Civil Service Commission. Flanagan, supra; Volz v. Civil Service Comm., 86 N. J. Super. 268, 276 (App. Div. 1965). Thus, this proposal is not negotiable because the Legislature has specifically delegated responsibility for this decision to the Civil Service Commission and it would therefore be fruitless for this item to be raised in collective negotiation. PERC's contrary holding is reversed.

*Item 6.* The Department of Civil Service shall publish the total score and all the elements of the total score for all promotional examinations.

 This is a procedural matter relating to promotion which PERC held to be a mandatorily negotiable term and condition of employment. The State does not challenge PERC's determination. However, the employer lacks authority to bind the Civil Service Commission by collective agreement. We accordingly disapprove PERC's holding.

*Non-Mandatory Items.*

PERC held that proposals 4d and 7 were not concerned with terms and conditions of employment.

*Item 4d.* Promotional examinations must be administered within ninety (90) days of the provisional appointment of an employee.

 This proposal is primarily procedural, but does not intimately affect employees and does involve a managerial determination. PERC's holding that it is not a mandatory item of negotiation is affirmed.

*Item 7.* The State shall eliminate any employee rating other than "satisfactory" or "unsatisfactory."

 Likewise, this proposal involves criteria for evaluating employees which is a managerial function. No matter how intimately employees are affected, this is a managerial prerogative. Moreover, *N. J. S. A.* 11:13–1 entrusts the use and establishment of service ratings to the Chief Examiner and Secretary of the Civil Service Commission:

The chief examiner and secretary shall establish in cooperation with departmental authorities for each class of positions or groups of classes in the classified service, standards of performance and output and a plan of service ratings based upon such standards * * *.

This statute thus deprives the public employer of any authority to modify the scheme of service ratings created by Civil Service. Hence, the mandatory negotiability of this item would be precluded for two reasons. No further comment need be made concerning items 7 or 8, as this case is solely concerned with what is and is not mandatorily negotiable. Our views concerning the purported existence of a permissive area of negotiability are found in *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.,* 78 *N. J.* 144 (1978).

## III

### Conclusion.

We affirm PERC's conclusion that proposals 3 and 4c are mandatorily negotiable. We affirm so much of PERC's order as holds that items 4d and 7 are not mandatorily negotiable. PERC's determinations that items 1, 2, 4a, b, e, 5 and 6 are mandatorily negotiable are reversed, as is PERC's holding in *Local 195, supra.* We disapprove PERC's determination concerning issue 6.

*For affirmance in part and reversal in part*—Chief Justice HUGHES, Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER and Judge CONFORD—7.

*Opposed*—None.