592 A.2d 547

IN THE MATTER OF NJ TRANSIT BUS OPERATIONS, INC., NEW JERSEY TRANSIT CORPORATION AND AMALGAMATED TRANSIT UNION, NEW JERSEY COUNCIL: NJ TRANSIT MERCER, INC., NEW JERSEY TRANSIT CORPORATION AND AMALGAMATED TRANSIT UNION, DIV. 540: NJ TRANSIT BUS OPERATIONS, INC., NEW JERSEY TRANSIT CORPORATION AND UNITED TRANSPORTATION UNION, LOCAL 33 (PATERSON AND WARWICK DIVS.); NJ TRANSIT BUS OPERATIONS, NEW JERSEY TRANSIT CORPORATION AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 225.

Argued September 25, 1990—Decided July 22, 1991.

*Jeffrey Freund,* a member of the District of Columbia bar, argued the cause for appellants The Amalgamated Transit Union, New Jersey Council, Amalgamated Transit Union Div. 540 and the Amalgamated Transit Union, AFL–CIO (*Reitman, Parsonnet, Maisel & Duggan* and *Weitzman & Rich,* attorneys; *Jeffrey Freund, Bennet D. Zurofsky, Jesse H. Strauss,* and *Richard P. Weitzman,* on the briefs).

*Edward D. Friedman,* a member of the District of Columbia bar, argued the cause for appellant United Transportation Union, Local 33 (Paterson and Warwick Divisions) (*Zazzali, Zazzali, Fagella & Nowak,* attorneys; *Edward D. Friedman* and *Robert Fagella,* on the brief).

*Robert E. Anderson,* General Counsel, argued the cause for appellant Public Employment Relations Commission.

*Jeffrey C. Burstein,* Deputy Attorney General, argued the cause for respondents NJ Transit Bus Operations, Inc., NJ Transit Mercer, Inc. and New Jersey Transit Corporation (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

*Alan Parwich* and *Malcolm A. Goldstein,* a member of the New York bar, submitted a letter brief on behalf of appellant Transport Workers Union of America, AFL–CIO, Local 225 (*Feintuch & Parwich,* attorneys).

The opinion of the Court was delivered by

WILENTZ, C.J.

In 1979 the Legislature passed the Public Transportation Act (the Act), *L.*1979, *c.* 150, *N.J.S.A.* 27:25–1 to –24, creating New Jersey Transit (NJT), a public corporation, for the purpose of converting New Jersey's mass-transit system from one of private enterprise to one owned and operated by the State. NJT, through use of federal funds, either directly or through subsidi-

aries acquired mass-transit companies and their assets, mainly buses and trains, and became the employer of the existing mass-transit work force. This case involves the rights of that work force, formerly protected by private sector collective bargaining agreements.

The question presented is whether NJT employees' labor rights are identical (except for explicit statutory differences) and limited to those granted to all other public employees in New Jersey under the Employer/Employee Relations Act (EERA), *N.J.S.A.* 34:13A–1 to –21, or whether the Act intended different standards to apply to these employees in recognition of their former status as unionized workers for a private enterprise. Specifically, the question is whether the scope of negotiations, that is to say the matters about which the employees and the employer are required to negotiate, is subject to the restrictions imposed by this Court in interpreting the EERA, see *State v. State Supervisory Employees Association*, 78 *N.J.* 54, 67, 80–82, 393 *A.*2d 233 (1978) (*State Supervisory*), or whether the Act allows, as held by the Public Employment Relations Commission (PERC) in its decision below, a substantially broader ambit of negotiations.

In *State Supervisory*, we ruled that three considerations determine whether a subject is negotiable under the EERA. First, it must "intimately and directly affect the work and welfare of public employees." *Id.* at 67, 393 *A.*2d 233. Second, it must "not significantly interfere with the exercise of inherent management prerogatives pertaining to the determination of governmental policy." *Ibid.* Third, the subject must not have been preempted by statute or regulation. *Id.* at 67, 80–82, 393 *A.*2d 233. *See In re IFPTE Local 195 v. State*, 88 *N.J.* 393, 404–05, 443 *A.*2d 187 (1982) (setting forth the three-part test). PERC concluded that the Legislature did not intend those tests to apply to the relationship between NJT and its employees, but rather that the scope of negotiations, except for explicit statutory provisions, both in the Act and elsewhere, is limited only so

far as is necessary to assure the accomplishment of NJT's "statutory mission." The Appellate Division reversed PERC's decision, concluding that NJT employees are to be treated the same as all other public employees, except as explicitly provided in the Act.

■ We reverse. We hold that the Legislature intended to confer such rights on these employees as would place them in the same position they had in the private sector, subject only to the overriding responsibility and power of government to accomplish the goals of the Act. In particular, we are in accord with PERC's "statutory mission" standard, subject to modification by PERC or by this Court in the event its application in the future falls short of that goal.

## I.

Pursuant to the provisions of the Act, in 1980 NJT acquired Transport of New Jersey, a private bus company, and its subsidiary Maplewood Equipment Company, and in 1984 NJT acquired Mercer County Improvement Authority, which operated bus services in Mercer County. The acquired companies had millions of dollars of equipment and thousands of employees, who were largely unionized members of the New Jersey Council of Amalgamated Transit Union, United Transportation Union Local 33, Transport Workers Union of America Local No. 225, and Division 540 of Amalgamated Transit Union. (We refer to them throughout as the unions.) Collective bargaining agreements were in place covering the union members at the time of the acquisition. The Act explicitly preserved the rights of the employees under those agreements until the expiration date of the agreements. The issue before us arises from the attempt of NJT and the unions to negotiate new contracts. The dispute between NJT and the unions concerns what matters are properly the subject of negotiations and what matters are committed

to the exclusive determination of the employer, NJT.[1] The dispute regarding the scope of negotiations goes to the heart of the employer/employee relationship, for it determines which matters employees may negotiate about and thereby assure protection of their interests, and which matters may be unilaterally determined by the employer. "Scope of negotiations" determinations are important in all public employee cases, but especially here, for although there is no right to strike, there is a provision in the Act allowing interest arbitration when the employer and employee fail to agree concerning a matter. *N.J.S.A.* 27:25–14c (making applicable *N.J.S.A.* 34:13A–16(d)(2) to –21, providing interest arbitration for police and fire departments). Therefore, if a matter is within the scope of negotiations, the Act entitles the employees not only to negotiate but if unsuccessful at the negotiating table, assures them, if impasse results, of a determination by a neutral arbitrator.

In the course of the contract renewal negotiations, numerous disputes developed regarding the appropriate scope of those negotiations. For instance, the parties disputed whether issues such as seniority, bidding of runs, and filing of vacancies are subject to mandatory negotiation. Pursuant to the EERA, NJT filed seven petitions with PERC for scope determinations. The unions contended that their labor rights are governed by the Labor Management Relations Act (LMRA), 29 *U.S.C.A.* §§ 151–187, and that their rights as employees, except for the right to strike, are precisely the same as those of other employees in the private sector. NJT contended that except for certain explicit provisions in the Act, the rights of these new public employees are governed by the EERA and are no greater than the rights of any other public employees. PERC rejected both contentions and formulated its own standard, a new standard, concerning

---

[1]For the purpose of this case, the parties have dealt with "scope of negotiations" on the premise that issues are either mandatorily negotiable or mandatorily non-negotiable; they do not raise the question of whether another category, permissive negotiability, exists.

scope of negotiations and, inferentially, the extent of the rights of these new public employees. Based on its analysis of the Act, PERC decided that the proper standard to determine scope was whether allowing negotiations on a matter would substantially interfere with the accomplishment of the statutory mission of NJT: if it would, negotiations were barred, if not, negotiations were mandatory. Applying this standard, PERC ruled that practically all the contested matters were subject to mandatory negotiations. NJT appealed to the Appellate Division maintaining its prior position.[2] The unions did not cross-appeal but rather accepted, as they do here, PERC's formulation of the appropriate standard.

The Appellate Division, finding evidence in the Act pointing both ways, concluded that the requisite clarity of legislative intent necessary to treat these employees differently from other public employees was lacking; and furthermore, that the Act is devoid of any indication whatsoever that would support the standard adopted by PERC. It found the legislative history unpersuasive and held that the Legislature intended to treat NJT's employees precisely the same as other public employees, except where the statute explicitly provided the contrary. Consequently, the Appellate Division reversed and remanded the matter to PERC for its application of the EERA standards.

On the union's and PERC's petitions, we granted certification. 118 *N.J.* 196, 570 *A.*2d 960 (1989). Subsequently, PERC rendered a second opinion. In accordance with the Appellate Division's decision, PERC applied the EERA standards to NJT's scope petitions. Practically all the contested matters that it then decided were *not* subject to negotiations had previously

---

[2]Shortly after PERC's initial ruling, interest arbitration began between NJT and the New Jersey Council of the Amalgamated Transit Union. No one sought a stay of PERC's ruling, and the arbitrator rendered an award prior to the Appellate Division's decision. Presumably, the award was consistent with PERC's initial opinion now affirmed by this Court. Thus, we assume that the interest arbitration award is not affected by our decision.

been ruled mandatorily negotiable under its prior decision. PERC's second opinion demonstrates the significance of the statutory mission test and highlights the differences between it and the standard applicable to public employees in general.

## II.

Mass transit in this country traditionally had been the domain of private enterprise. Its workers generally were subject to the same rules, practices, laws, and regulations as others in private employment. Private-sector labor relationships in modern times have been governed by the LMRA with the full panoply of collective bargaining rights, including the right to strike, unfair labor practices, and administrative rule making.[3] As the private sector's inability to operate mass transit efficiently and profitably became apparent, government started to subsidize private operations, and did so quite heavily. The need for mass transit, especially in urban areas, was generally recognized. After some time, however, subsidies were perceived as ineffective, not a sufficient answer to the problem. Whatever the cause—and both management and labor inefficiencies were identified—the situation did not improve.

In 1964 Congress responded to the problems of mass transportation by enacting the Urban Mass Transportation Act (UMTA), 49 *U.S.C.A.*App. §§ 1601–21. UMTA makes substantial federal funds available to the states to enable them to acquire and to operate mass transit systems. This financial aid is the heart of UMTA and reflects Congress' belief that government ownership and operation of mass transit promised greater

---

[3]The labor relations for NJT's rail operations are not involved in this decision because of the preemption by the Railway Labor Act (RLA), 45 *U.S.C.* §§ 151–88. Because of the RLA's preemption, railroad employees are expressly excluded from the definition of "employee" in the EERA. *N.J.S.A.* 34:13A–3(d). In addition, the right to strike by non-railroad transit employees is not raised because all parties acknowledge the express provision of the Act prohibiting such strikes, *N.J.S.A.* 27:25–14c.

results than did subsidies. In effect, Congress concluded not only that subsidies were needed to assure this vital service, but that government could manage mass transportation better than private enterprise could.

Whatever the basis of Congress' conclusion that government could better manage the buses and trains, it was not premised on any notion of increasing the legal power of the employer (government) in its relations with its employees. UMTA explicitly conditions its grants on a State's assurance that the formerly unionized workers would retain protections and rights similar to those they had formerly enjoyed. Pursuant to UMTA, the Secretary of Labor must, as a condition of assistance, certify that "fair and equitable arrangements are made ... to protect the interests of employees affected by such assistance ..., [including] the continuation of collective bargaining rights." 49 *U.S.C.A.*App. § 1609(c). No grant for either capital or operating expenses may be made unless the Secretary of Labor certifies that such protection is assured. UMTA allows for decertification, and presumably the ultimate loss of grants, when that condition is not satisfied.

Without doubt, but for UMTA, New Jersey—and most States—would not have acquired these mass-transit facilities when it did. Federal money was critical to the acquisition. And without doubt the Act itself was designed to satisfy the UMTA condition. We do not suggest that the Act must therefore be read so as to conform perfectly to that condition, for as noted later there is considerable doubt about its precise, and perhaps even its general, requirements. The point here, as the Act and its history show, is that from the very outset the Legislature did not intend to treat these employees the same as all other public employees—they are different.

The conditional nature of the UMTA grants is not the only factor that supports the conclusion that the Legislature intended to treat NJT employees differently from other public employees. The factors that led Congress to impose the condition

were undoubtedly at work in the New Jersey Legislature. They were considerations of equity and politics. As to the latter, thousands of New Jersey workers traditionally vested with all of the rights given to organized labor were about to be transferred to the public sector. The Legislature was aware that these employees wanted to preserve their labor rights to the greatest extent, and it is fair to assume that this fact influenced the Legislature to some extent. Furthermore, as a matter of equity, these employees did not choose to go into public service nor did they forfeit the protections of collective bargaining through some fault of their own. They were simply workers who found they had a new boss. They had no reason to believe that that would diminish their fundamental rights as workers. And the Legislature, presumably, responded to that factor as well.

We pause to mention again, and to emphasize, what was *not* the premise of Congress' conclusion that mass transit would benefit from governmental ownership and operation. No evidence suggests that Congress believed that in order to achieve this improvement, government required greater legal power over the work force than private enterprise or that the collective bargaining rights of labor had to be curtailed. Indeed, the contrary is evidenced by the conditional nature of the UMTA grants. The Act itself reflects this conclusion. While it explicitly rejects the right to strike, many of its provisions expanded traditional public employee rights. Even respecting the loss of the right to strike, the Act substitutes the right of interest arbitration, unprecedented in New Jersey for public employees, except for police and firefighters. We note these facts because given the admitted lack of explicit legislative guidance on the issue before us, they are of some importance in our approach to this legislation. Neither Congress, the Legislature, nor any of the parties before us made any implicit argument that in order to operate mass transit effectively these employees must be relegated to some lesser status, that their rights as workers must be diminished or that they must be treated as ordinary

public employees. This is a business, an enterprise, traditionally run by private enterprise, not a governmental function for which sovereign power in labor relations was believed essential to its success and to the protection of the public. Congress sought good, strong, effective management aided by an infusion of federal funds, not a labor organization relatively weakened by a loss of rights.

In short, construction of the Act should not be approached with an *a priori* presumption of the necessity of preserving governmental management prerogatives traditional in public employment relations. Those governmental management prerogatives never existed in the transportation field. The question that remains is to what extent were these governmental management prerogatives intended to be *conferred*, given the Act's intent, as we so find, to significantly preserve the prior labor relations rights of the mass-transit work force. A fair reading of the Appellate Division opinion leads to the conclusion that that court regarded the issue as whether the Legislature clearly evinced an intent to treat *these public employees* differently from—better than—others. We believe it is just as appropriate, given the Act's background and history, to examine the Act in order to determine the extent to which the Legislature intended to treat these formerly *private sector employees* worse than they had been treated before.

### III.

The Act's legislative history, although confirming the Legislature's knowledge of the requirement of UMTA concerning the preservation of employee's rights, does not reveal anything significant about the standards the Legislature intended to apply to this employee/employer relationship. The record of the hearings held includes a senator's remark that the word "negotiations" was used in the Act simply to show that strikes are not permitted. *Hearings on S. 3137 Before the Comm. on Transportation and Communication,* April 4, 1979, at 13

(statement of Senator S. Thomas Gagliano). Although that explanation alone may not be too persuasive, the Act itself is.

NJT, in support of its position, notes that if the Legislature had intended these employees to have the same rights as private employees under the LMRA (the initial position of the union), it could easily have said so—in one sentence; and the unions note that if the Legislature had intended to treat these employees in the same way as all other public employees (the present position of NJT), it could easily have said so—again in one sentence. Instead the Legislature took several pages, many sections, and numerous sentences to say what it meant about the status of these employees and their labor relations. The obvious conclusion is that it intended neither result—these were not to be employees governed by the LMRA, or employees governed by the EERA—and that is what PERC correctly held. That primary conclusion is of substantial importance, for it conflicts directly with the decision before us, namely, the decision that, except for the explicit statutory differences, the Act intended to equate the rights of these mass-transit workers with those of the ordinary New Jersey public employee.

While the Act may not clearly spell out the Legislature's intended standard governing this case—and it is a fair inference that the Legislature never formulated one—its most critical provisions simply do not conform to a construction equating mass-transit employees' rights with those of other public employees.

The relevant portions of *N.J.S.A.* 27:25–14 are subsections b through e. Subsection b provides that "[i]n accordance with law, employees of the employer shall have *and retain* their rights to form, join or assist labor organizations and to negotiate collectively through exclusive representatives of their own choosing." (Emphasis supplied.) Whatever else may be said of this subsection, it quite clearly contains the spirit of UMTA's condition that these workers *retain* certain rights, and, fairly read, one of those retained rights is the right "to negotiate

collectively through exclusive representatives of their own choosing." Why "retain"? What place does that word have in this situation if not to assure that these formerly private employees are to preserve something that might otherwise be taken away from them through the construction of a statute? While this section alone does not support the conclusion that they maintain all rights except the right to strike, it clearly sets the stage for a reading of the statute that preserves some portion of those rights.

Subsection c, similarly non-dispositive by itself, reinforces the clear intention to distinguish these employees from other public employees. It provides that "[t]he *enforcement* of the rights and duties of the employer and employees shall be governed by the [EERA] and shall be *within the jurisdiction* of [PERC] established pursuant to that Act." (Emphasis supplied.) If NJT were correct this statute would read "the rights and duties of the employer and employees shall be governed by the EERA as administered by PERC established pursuant to that Act." When the actual language of this sentence is juxtaposed against what the sentence would say if NJT were correct, the difference is most persuasive. It seems clear that by restricting the EERA provisions to those concerning *enforcement* of rights and duties, rather than applying them to define the rights and duties themselves, the Legislature limited PERC to function as the entity that would do the enforcing. This is not a case of "you could have said it in one sentence," but rather a case of having said what was intended quite differently in one sentence from the way another sentence would have. More than that, the very next sentence not only instructs PERC to "be guided by the relevant Federal or State labor law and practices"—not terribly different from what PERC now does in the public employment field—but also instructs PERC that the labor law and practices it should be guided by are those "as developed under" the LMRA or the Railway Labor Act, "provided however that employees shall not have the right to strike except as provided by the Railway Labor Act."

This legislative direction to PERC provides a strong argument for the contention that the underlying substantive rights and duties governing labor relations are to be those of the LMRA, except for the right to strike. This construction is perfectly consistent with the use of the word "retain" and the limitation of the effect of the EERA to a system of enforcement. Although the use of the LMRA to determine the scope of negotiations has not been a practice in the past, that is very simply because it has been well understood that the scope of negotiations in the public employment area is different from that in private employment. Here, however, given the Act's application to labor relations in all respects, there is no reason to believe that scope of negotiations is not intended to be included.

Section c goes on to provide that on impasse the interest arbitration procedures applicable to police and firefighters, *see N.J.S.A.* 34:13A–16d(2) to –21, shall apply. Presumably this provision has as its primary objective the avoidance of strikes— illegal or not. It has other implications of importance here, however, in this most critical economic sector, formerly private, now public, with employees who no longer have the right to strike. It represents what is undoubtedly the most significant difference between the rights of other public employees and the mass-transit workers covered by the Act. It is a monumental difference, unprecedented in the public employee field, except for police and firefighters. Whenever public employees reach impasse with their public employer, there are a host of procedures available to resolve the impasse, but when push comes to shove, it is the employer's last offer, its unilateral last offer, that prevails and, by law, the employees must abide by it. *See City of Jersey City,* PERC No. 77–58, 3 *NJPER* ¶ 122 (1977) (holding that it was not an unfair labor practice for a public employer to implement its last best offer when impasse remains after having gone through both mediation and fact-finding), *reaffirmed in Bayonne City Bd. of Educ.,* PERC No. 91–3, 16 *NJPER* ¶ 21184 (1990). Here the parties are on a footing of

absolute equality, the Legislature has decreed that when these formerly private employees find themselves unable to agree with their employer, they may not strike but are otherwise equal, for they may commit the interest dispute, be it money or other matters, to neutral arbitrators for binding resolution. When combined with the other provisions of the Act pointing in the direction of different treatment, this provision is of most significant impact. The public employer has been stripped by the Legislature of its power unilaterally to control the cost of labor and all of the other aspects of the labor relationship; it stands no better off than the public employees in the negotiating process. Although NJT could argue that this provides all the more reason for restricting the scope of negotiations, because that which is negotiable becomes arbitrable, the real implication of the provision is that the Legislature intended these public employees to be treated quite differently from others.

Subsection d is probably the subsection most persuasive not only of the Legislature's intention to treat these employees differently but also of how it intended to treat them. It provides that "[i]t shall be the mutual obligation of the employer and the majority representative of any of its employees to negotiate collectively with respect to mandatorily negotiable subjects which intimately and directly affect the work and welfare of employees." *N.J.S.A.* 27:25–14d. This language, copied verbatim from our definition of the scope of negotiations in *State Supervisory,* pointedly, and presumably intentionally, omitted the balance of that formulation. There, construing the general language of the EERA, we said that "negotiable terms and conditions of employment are those matters which intimately and directly affect the work and welfare of public employees *and on which negotiated agreement would not significantly interfere with the exercise of inherent management prerogatives pertaining to the determination of governmental policy.*" 78 *N.J.* at 67, 393 *A.*2d 233 (emphasis supplied). We presume, as a matter of statutory construction, that the Legis-

lature was aware of this definition. *Quaremba v. Allan,* 67 *N.J.* 1, 334 *A.*2d 321 (1975). Indeed, this definition was probably well known to those who drafted the Act. The Act's modification of this definition as it applies to NJT employees, then, was almost certainly intentional. After we analyze all of the parties logical arguments, we are left with the conclusion that this intentional modification indicates that the Legislature did *not* intend to limit the scope of negotiations between NJT and its employees by the management prerogative prong of *State Supervisory.*

This conclusion is reinforced by the next sentence of subsection d, which provides that the subjects on which mandatory negotiations are required *"include* wages, hours of work, the maintenance of union security and check-off arrangements, pensions, and other terms and conditions of employment." (Emphasis supplied.) This list, not exhaustive, of subjects mandatorily negotiable contains at least three items on which ordinary public employees had no right to negotiate—union security, check-off, and pensions. At the time the Act was passed, these three rights were antithetical to any right possessed by public employees. The EERA contained no provision pertaining to union security or check-off, nor did public employees have the right to bargain over pensions, *see State Supervisory, supra,* 78 *N.J.* at 83, 393 *A.*2d 233. The EERA now contains provisions requiring negotiations over representative fees in lieu of dues and collection of these fees via payroll deduction. *N.J.S.A.* 34:13A–5.5, –5.6. The Legislature, however, made those matters mandatorily negotiable under the EERA *after* it passed the Act. The Act is contained in Laws of 1979, chapter 150 and took effect in July 1979. The provisions of the EERA relating to representative fees and payroll deduction are contained in Laws of 1979, chapter 477, were not approved until February 1980 and did not become effective until July 1980. Therefore, the comparison between the Act's union security and check-off rights, language traditionally associated with private sector collective bargaining, and the EERA's repre-

sentative fees and payroll deduction, language traditionally associated with public sector collective negotiation, evinces a distinction well beyond that in the words used. It reveals a substantive difference. The Act granted these negotiating rights to NJT employees at a time when public employees in New Jersey simply had no corresponding rights, whatever the syntax in which those rights were contained. The Act's provisions relating to union security and check-off, together with its provision for mandatory negotiation over pensions, a right which ordinary public employees still do not enjoy, compels the decision reached by PERC: the Legislature intended to treat NJT employees differently than it treats all other public employees in New Jersey.

The language of this most important part of the Act, in this connection, where the issue is scope of negotiations, while not defining that scope in accordance with the LMRA, comes much closer to it than to the EERA: it completely eliminates the governmental management prerogative that has been the source of most of our limitation on the scope of negotiations, and by example it includes matters that that limitation would otherwise exclude. Whatever else this subsection d does, it proves beyond debate that these employees were not to be treated like other public employees. It may not determine what the standard is but certainly establishes what it is not.

Finally, although not of great importance, subsection e requires NJT to give "due consideration to preserving established bargaining relationships to the extent consistent with the purposes of" the Act in operating mass transit, and mandates that in order to change those relationships NJT must act in accordance with the LMRA. We need not determine the precise consequences of this provision, except to note it is special treatment for these employees, treatment designed to assure the preservation of their prior rights.

The responses of NJT to all of this are, in our opinion, hyperlogical and weak. They stress the continued repetition of the

word "negotiation" as if it obliterates all of the matters men-
tioned above and relegates these mass-transit workers to the
status of all other public employees simply because that word is
used.   We conclude the better interpretation is, as Senator
Gagliano advises, see *ante* at 51, 592 *A*.2d at 552, that the word
"negotiation" simply emphasizes the fact that the Act elimi-
nates the right to strike, and underlines the further intention
that these *are* public employees not to be treated solely as
employees whose rights are defined exclusively by LMRA.
NJT asserts, as a general proposition, that statutes in der-
ogation of government's power to control its employees, such
as the Act, must be construed not to surrender the sovereign's
control unless that intent is clear.   This proposition is correct as
applied to statutes dealing with those who are public employees
to start.   *See Ridgefield Park Educ. Ass'n v. Ridgefield Park
Bd. of Educ.*, 78 *N.J.* 144, 165–66, 393 *A*.2d 278 (1978); *Bur-
lington County College Faculty Ass'n v. Board of Trustees,*
64 *N.J.* 10, 16, 311 *A*.2d 733 (1973).   Here, however, the situa-
tion is unique.   We deal not with ordinary public employees but
with public employees formerly vested with full collective bar-
gaining right.[4]   If anything, the construction should be just the
reverse, for given the congressional intent, and the indications
of legislative intent, to preserve the collective bargaining rights
of these former private employees, we should construe the Act
to preserve these rights as long as a fair reading of it accom-
plishes that apparent legislative goal.

   No important State interest is served by construing the Act
to deprive NJT employees of rights that no one has found

---

[4]Although the Mercer County Improvement Authority (MCIA) was a public
employer at the time NJT took it over, we do not treat its former employees
differently.   In 1969, the MCIA purchased a failing private transportation
system pursuant to *N.J.S.A.* 40:37A–92 to –99.   The provisions of the enabling
law were written so that the MCIA employees retained the collective bargaining
rights they had before the county take-over with the exception of the right to
strike.   Therefore, the rights of MCIA public employees were virtually identical
to the rights of employees of privately owned transportation systems.

interfere in any way with the accomplishment of effective mass-transit service; no important State interest is served by expanding governmental management prerogatives in an area in which neither Congress nor the Legislature has indicated they are needed; no important State interest is served by depriving these workers of rights that they had every reason to believe they would retain. This statute, which goes to such lengths in order to carve out a special niche for these workers, should not be interpreted as putting them exactly in the place where other public employees find themselves. NJT employees were never public employees; they began their employment in the private sector and were assured that their private sector labor rights would be retained after NJT's takeover. No public purpose is served by following principles articulated for other reasons in other contexts.

We note that in the course of this legislation's passage, the Department of Transportation (DOT) issued a press release that clearly indicated its understanding that one of the purposes of the Act was to preserve the collective bargaining rights of the transit workers. Department of Transportation, *Press Release on Proposed Amendments to S. 3137*, June 7, 1979. Although the proposed amendments that accompanied this public release were not fully enacted, indeed although the portion referring to collective bargaining was stricken, the DOT's understanding of the underlying purpose of preserving the rights of these workers is significant. Even more significant, however, is the statement of the Governor at the time he signed the bill into law. His press release noted that "[e]mployees of acquired companies will maintain full collective bargaining rights and any unexpired existing contracts will be honored." Governor Brendan Byrne, *Press Release on Public Transportation Act of 1979, S. 3137*, July 17, 1979. As far as we have been informed, there was absolutely no contrary opinion expressed by anyone at the time.

## IV.

█ We are left with the question, then, of what standard should be applied in determining scope of negotiations. We have determined only that the prior standard applicable to other public employees does not apply here. Considering all the factors involved, we are satisfied that PERC has adequately balanced all the considerations and has formulated a standard that is not only workable but is in accord with what the Legislature intended and probably consistent with what it would have mandated had it expressed itself on this subject. Basically, that standard calls for negotiation on any subject that affects the employees' working conditions as long as such negotiations do not substantially interfere with the goals of NJT, with its "statutory mission." As interpreted by PERC in its rulings in its first opinion, this standard seems to mean that where the only consequence of negotiation is higher costs, that is not enough to bar negotiations.

Furthermore, the clear consequence of the Act's elimination of the management prerogative prong of *State Supervisory* is that abstract notions of the need for absolute governmental power in labor relations with its employees have no place in the consideration of what is negotiable between the government and its employees in mass transit. There must be more than some abstract principle involved; the negotiations must have the realistic possibility of preventing government from carrying out its task, from accomplishing its goals, from implementing its mission. All of the various rulings of PERC in its first opinion have that theme. They look to the actual consequences of allowing negotiations on the ability of NJT to operate and manage mass transit efficiently and effectively in New Jersey. If negotiations might lead to a resolution that would substantially impair that ability, negotiations are not permitted. But, if there is no such likelihood, they are mandatory. It is the effect on the ability to operate mass transit that is the touchstone of the test, rather than someone's notion of what government

generally should be allowed to unilaterally determine and what it should not.

We noted at the beginning of this opinion our acceptance of that standard, subject however to a determination of its effect on application to particular cases. "Scope of negotiations" determinations have an inevitable abstract factor. No one knows precisely how they will work out or what effects they will produce when applied. If the standard proves in certain cases, or in certain ways, to have results that indeed adversely affect government's ability to achieve its goals, we will feel free, as should PERC, to modify the standard. The Act does not lock this Court into any formula for determining the appropriate scope of negotiations, and this Court is not about to lock PERC into any similarly inflexible rule. Perhaps this flexibility is the most significant thing about the legislative silence, the same flexibility afforded by the legislative silence in the EERA that enabled this Court to formulate its own standard, based on the apparent legislative intent, growing out of that legislation. In effect, the Legislature has left to PERC and this Court divining from the Act's provisions what the working standard should be. It is just that, a working standard, and we shall see how it works. It is not embedded in the Act.

NJT employees previously had the benefits of collective bargaining. We intend by this resolution of the case to afford the NJT employees all of those rights to the extent they are consistent with the overriding governmental goal of assuring effective and efficient mass transit in New Jersey. We expect PERC to administer the standard in accordance with that objective.

## V.

We note here some observations about the condition in UMTA designed to preserve the preexisting bargaining rights of mass-transit workers. At the time the Legislature passed the Act, it intended to use UMTA funds to purchase private

transit companies and understood that the State would be required to abide by the labor protective provisions of UMTA, particularly section 13(c), 49 *U.S.C.A.*App. § 1609(c), as a condition of receiving funds under the Act.[5] However, in enacting the Act, the Legislature knew little about what the UMTA condition actually meant because the specific requirements for receiving UMTA funding are unclear.

According to the language of section 13(c) of UMTA,[6] in order for NJT to receive UMTA funding, the Secretary of Labor must certify that the unions can bargain with NJT essentially to the same extent as they could with the formerly private transit companies that now comprise NJT. *See Amalgamated Transit Union, Int'l, AFL–CIO v. Donovan*, 767 *F.*2d 939 (D.C.Cir.1985). In an opinion letter to the Amalgamated

---

[5]See *Hearings on S. 3137 Before the Comm. on Transp. & Communication*, March 28, 1979, at 14, 39 (*Hearings I*) (statement of Commissioner Louis Gambaccini, Department of Transportation); *Hearings on S. 3137 Before the Comm. on Transp. & Communication*, April 4, 1979, at 13–15 (*Hearings II*) (statements of Senator S. Thomas Gagliano, Senator Francis X. Herbert, and Kenneth R. Moore, representing United Transportation Union); see also *Hearings I, supra*, at 43–44, 57, 61, 37X, and *Hearings II, supra*, at 28 (statements of various witnesses).

[6]Section 13(c) provides for five guarantees:
1) The continuation of collective bargaining rights.
2) The preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise.
3) Workers must be protected against a worsening of their employment positions.
4) Employees affected by acquisitions must be given assurances of employment, and laid-off or terminated workers must be given reemployment priority.
5) Paid training or retraining programs must exist. Arrangements must include provisions protecting individual employees against a worsening of their positions with respect to their employment.

The terms and conditions of the section 13(c) arrangements are included in the grant contract between the Department of Labor and the recipient. If each of the five section 13(c) guarantees does not exist or is removed from NJT employee contracts, New Jersey may lose UMTA funding.

Transit Union (ATU), the Secretary of Labor indicated that if the courts dilute the rights of NJT employees conferred by PERC in its initial decision below, then certification would be suspended.[7]

According to that letter, in order to receive federal funding, the NJT–Union contract must encompass "all subjects deemed mandatory subjects of collective bargaining as measured against the requirements articulated in *Amalgamated Transit Union v. Donovan,* 767 F.2d 939 (D.C.Cir.1985)." Letter from U.S. Department of Labor to Urban Mass Transportation Administration (received May 10, 1988, by ATU Legal Department). In *Donovan,* the D.C. Circuit held that the Secretary of Labor had improperly certified the Atlanta transit authority's labor arrangement. The central dispute in *Donovan* was the Secretary of Labor's conditional certification of grants to three transit authorities despite the lack of an agreed method of impasse resolution. In each case, management had refused to agree to the usual provision for the submission of impasses to binding interest arbitration. Certification was given on the condition that negotiations would continue. The unions involved sued for review of the Secretary's action as an abuse of discretion and for a temporary injunction to prevent disbursement of the grant funds. A Labor Department official, in an

---

[7]In response to an ATU challenge to U.S. Department of Labor (DOL) certification of NJT, the DOL indicated in a decision letter, received by the ATU Legal Department, that it "has concluded that the requirements of 13(c) may no longer be met in the event that the PERC's [first] decision is reversed in whole or in part. Therefore, if the PERC decision is modified by the State Court on appeal, this certification is suspended." Letter from John R. Stepp, Deputy Under Secretary for Labor–Management Relations and Cooperative Programs of the U.S. Department of Labor, to Hiram J. Walker, Urban Mass Transportation Administration Regional Manager (received May 10, 1988 by ATU Legal Department).

Petitioner unions have apparently notified the Secretary of Labor that PERC's first decision was reversed by the Appellate Division and that the Secretary must suspend NJT's certification. This Court is unaware of any subsequent action taken by the DOL to decertify NJT.

affidavit submitted to the court, interpreted section 13(c) as not requiring any particular form of impasse resolution and stated that certification without any such procedure would be allowed in some circumstances. The court ruled that although nothing in UMTA preempts a State's ability to adopt any constitutionally permissible public sector collective bargaining law they choose, States have no automatic entitlement to federal funding for their transit systems and must satisfy section 13(c) if they desire funding. According to the court:

> [S]ection 13(c) ... was designed to preserve the status quo such that, where workers enjoyed collective bargaining rights prior to a state's acquisition of a transit system with federal money, those workers were to be "assured of a continuance of collective bargaining" 109 Cong.Rec. 5672 (1963). Maintaining the status quo usually meant substantially preserving collective bargaining rights that had been established by federal labor policy. [767 *F.*2d at 948.]

The court wrote further that the legislative history "reveals Congress' clear intent to measure state labor laws against the standards of collective bargaining established by federal labor policy," *ibid.*, and "where a state, through its laws or otherwise, fails to satisfy the requirements of § 13(c), the Secretary must cut off funds by denying certification," *id.* at 948 n. 9. The court found specifically that a transit authority must be able to bargain over, among other things, aspects of scheduling, part-time employment, work assignments, and promotions in order to comply with section 13(c)(2) of the UMTA. In so finding, the court ruled that the Secretary of Labor had an affirmative duty to decertify the transit authority:

> Because we read the plain language of the [UMTA] and its legislative history as mandating, rather than simply recommending, the continuation of collective bargaining rights, and because, by virtue of the current Georgia law, MARTA's labor agreement with ATU does not provide for the continuation of such rights, we reverse the judgment below, with instructions that the District Court *require the Secretary to revoke his certification.* [*Id.* at 941 (emphasis added).]

Thus, the Secretary is seemingly obligated to decertify a transit authority when the contract between the authority and its employees fails to respect pre-takeover collective bargaining

rights.[8]

Case law supports the conclusion that states are empowered to control their own transit systems, at the risk of being denied federal assistance. *See Local Div. 589, Amalgamated Transit Union v. Massachusetts,* 666 *F.*2d 618, 627 (1st Cir.1981) ("Congress intended state law, not § 13(c) assurances, to prevail in case of a conflict."), *cert. denied,* 457 *U.S.* 1117, 102 *S.Ct.* 2928, 73 *L.Ed.*2d 1329 (1982). With the possible exception of the *Donovan* opinion, however, there is virtually no guidance from the case law, legislative history, or documented action by the Department of Labor (DOL) to aid determining precisely at what point conflicts between state law and section 13(c) will result in the DOL's discretionary or mandatory decertification and defunding of a state transit system.

Even though the legislators did not know, as a matter of fact they knew even less than we know now, and we know very little now, what the UMTA condition meant, their cognizance of the UMTA condition indicates that they must have been aware of the need to protect the prior labor relation rights of these employees and that they obviously had this in mind when they passed the Act. In any event, this Court should not, and has not, decided this case based on the extra-judicial dilemma over the prospect of lost funding. We have used the UMTA condition only to help us interpret legislative intent, and not for any other purpose.

## VI.

Applying the standards formulated in its first opinion, PERC made specific rulings on each of the scope of negotiations issues put before it. After reversal by the Appellate Division, but before this decision, PERC revised that opinion and the consequent rulings, based on the Appellate Division's determi-

---

[8]It is unclear whether the Secretary of Labor ultimately decertified or denied funding even though the Circuit Court so ordered.

nation that the prior standards applicable to scope of negotiations in public employment apply to NJT employees. It reversed many of its prior rulings. The Appellate Division has never had the opportunity to rule either on the first opinion or on the second, on whether either opinion conformed to the applicable standards. Having now held that the initial standard formulated by PERC is the correct one, we remand the case to the Appellate Division to review PERC's specific rulings in order to determine whether they conform to the "statutory mission" test as first formulated by PERC and now affirmed by this Court.

*For remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*Opposed*—None.