678 A.2d 726

IN THE MATTER OF NEW JERSEY TURNPIKE AUTHORITY, PETITIONER–RESPONDENT, AND LOCAL 194, IFPTE, AFL/CIO–CLC, RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued June 4, 1996—Decided July 11, 1996.

Before Judges PRESSLER, WEFING and KOLE.

*Bennet D. Zurofsky* argued the cause for appellant (*Reitman Parsonnet*, attorneys; *Mr. Zurofsky*, on the brief).

*Frank R. Campisano* argued the cause for respondent (*Schwartz, Tobia & Stanziale*, attorneys; *Mr. Campisano* and *Jill A. Tobia*, on the brief).

*Robert E. Anderson*, General Counsel for the Public Employment Relations Commission, filed a statement in lieu of brief.

The opinion of the court was delivered by

KOLE, J.A.D. (retired and temporarily assigned on recall).

The issue in this case concerns the authority of the New Jersey Turnpike Authority (Authority) to negotiate with a union of its employees with respect to a decision as to employee layoffs. Is such a decision a matter of managerial prerogative which may not be negotiated, pursuant to such cases as *State v. State Supervisory Employees Association,* 78 *N.J.* 54, 393 *A.*2d 233 (1978)? [1] *Id.* at 88, 393 *A.*2d 233. The resolution of that question, in turn, depends upon whether the Authority is a "public employer" within the meaning and policy of the New Jersey Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 through 21, as supplemented (the Act), with the restrictions on its powers imposed by that Act.

The Public Employment Relations Commission (PERC), on the Authority's scope of negotiations petition, held that a decision as to layoffs was a managerial function and thus could not be negotiated with the union. The union appeals.

The union contends that the contractual language here involved does not result in interference with inherent management prerogatives in the determination of governmental policy and that a review of the relevant statutory language supports the conclusion that the governmental policies at stake in public bodies other than the Authority, to which *State Supervisory, supra,* applies, are not present with respect to the Authority. It claims that the Authority is akin to a private, rather than a public, entity.

We are satisfied that under the applicable statutory and case law, the Authority is covered by the Act and, as to the negotiable versus non-negotiable managerial matters, is in no different position from any other public agency subject to the Act. Even if the issue were debatable, we would be constrained to defer to the expertise of PERC in this scope of negotiations matter.

---

[1] In *State Supervisory,* the Court stated that a decision to cut the work force to a certain number unquestionably is a predominantly managerial function. *Id.* at 88, 393 *A.*2d 233.

*State Supervisory Employees Association, supra,* 78 *N.J.* at 83, 393 *A.*2d 233; *State v. Communications Workers,* 285 *N.J.Super.* 541, 548, 667 *A.*2d 1070 (App.Div.1995).

In 1970, the union and the Authority had negotiated agreements regarding terms and conditions of employment for permanent, full-time toll collectors, utility workers and maintenance employees. That contract is the source of the language regarding layoffs that is at issue in the instant appeal. In 1972, the Authority entered into another union contract relating to its permanent full-time office, clerical and technical employees. This contract also contained language regarding layoffs. The same language has been present for twenty-five years in the union contracts.

The most recent agreement contains the following language in Article XXII, entitled "Layoff":

> In the Operating Unit, layoffs will only occur as a result of an Act of God and shall be according to seniority within each department and each classification. Those laid off last will be the first offered reinstatement. Employees shall be advised a minimum of thirty (30) days in advance of any layoff. Seniority shall not be lost in the event of recall within two (2) years of the date of the employee's layoff. In the Office, Clerical and Technical Unit, before there are any layoffs of employees in the Unit, the Authority agrees to meet and negotiate with the Union concerning the conditions.

The last contract between the parties covered a period from June 29, 1992 through July 2, 1995. The union is presently engaged in negotiations for a successor agreement with the Authority. In the course of those negotiations the union proposed that the existing language be unchanged. Rather than negotiate, the Authority filed the instant scope of negotiations petition, in which it sought to have the layoff provisions of the Article declared non-negotiable. According to the union, that petition has complicated and delayed the negotiations. The parties have not yet agreed upon a successor contract.

PERC's order is not a model of clarity. It states:

> Article XXII is not mandatorily negotiable to the extent that its first sentence precludes layoff unless caused by "an Act of God" and to the extent that its last sentence may be read to require the New Jersey Turnpike Authority to "meet and

negotiate" over a decision to lay off employees in the office, clerical and technical unit.

The union correctly interprets this order as sustaining the negotiability of those portions of Article XXII which require layoffs (once decided upon by the Authority) and recall to take place in accordance with seniority within each department and classification; which require thirty days' notice in advance of a layoff; and which preserve seniority upon recall. At least on the surface, these matters (1) are terms and conditions of employment which intimately and directly affect the work and welfare of public employees and on which a negotiated agreement would not significantly interfere with the exercise of inherent management prerogatives pertaining to the determination of governmental policy, or (2) are, in part, procedural aspects of managerial prerogatives. *See Council of New Jersey State College Locals v. State Bd. of Higher Education*, 91 *N.J.* 18, 32–33, 449 *A.*2d 1244 (1982); *In re IFPTE Local 195 v. State*, 88 *N.J.* 393, 418, 443 *A.*2d 187 (1982); *State Supervisory supra*, 78 *N.J.* at 84, 393 *A.*2d 233; *Rutgers v. Council of AAUP Chapters*, 256 *N.J.Super.* 104, 115–120, 606 *A.*2d 822 (App.Div.1992), *aff'd* 131 *N.J.* 118, 618 *A.*2d 853 (1993).

However, we do not interpret the PERC order, as the union does, to require the Authority "to meet and negotiate the terms and conditions, or effects, of any layoff in the clerical unit." *See Rutgers, supra*, 256 *N.J.Super.* at 118, 606 *A.*2d 822 (the "impact" of managerial prerogative determinations are not negotiable). The extent to which, if at all, a specific matter "impacts" on a decision to lay off employees must be decided on a case to case basis, depending on the provision involved. *See, e.g., In re IFPTE supra*. Thus, PERC only declared non-negotiable those portions of Article XXII that it found prohibited any layoffs, except those occasioned by "Acts of God," or required negotiation of the decision to make layoffs in the clerical unit.

Under the Act, the term "employer" includes "public employers" and means the State "or *any authority*, commission or board or any branch or agency of the public service." *N.J.S.A.* 34:13A–3(c) (emphasis supplied). The statute creating the Authority

plainly acknowledges that it is an "instrumentality exercising public and essential governmental functions, and the exercise by the Authority of the powers conferred by this act in the acquisition, construction, operation and maintenance of turnpike projects or any part thereof shall be deemed and held to be an essential governmental function of the State." *N.J.S.A.* 27:23–3(A).

In other contexts the Authority and its employees have been recognized as a state agency. *See N.J. Turnpike Employees v. N.J. Turnpike Auth.,* 200 *N.J.Super.* 48, 52–53, 490 *A.*2d 338 (App.Div.1985); *Garden State Pkway Emp. v. N.J. Highway Auth.,* 105 *N.J.Super.* 168, 170–171, 251 *A.*2d 463 (App.Div.1969) (". . . whenever the Legislature intended to include authorities within the ambit of certain legislation, it expressly so provided. See *N.J.S.A.* 34:13A–3(c), part of the 1968 New Jersey Employer–Employees Relations Act . . .")

In the *N.J. Turnpike Employees* case, *supra,* we stated that Turnpike Authority employees are "persons in public employment" and thus share the burdens and benefits of *N.J. Const.* (1947), Art. I, par. 19, despite the fact that the provision refers only to "political subdivisions or agencies" and does not include reference to authorities (citing *N.J. Turnpike Auth. v. Amer. etc. Employees,* 83 *N.J.Super.* 389, 200 *A.*2d 134 (Ch.Div.1964)). We also held that a statute providing that persons holding any "public employment under the government of this State" must avoid criminal conduct or sacrifice their state position, applied to employees of the New Jersey Turnpike Authority, as persons whose employment "was under the government of this State;" that the Authority must dismiss such employees; and that issue was not arbitrable under the union contract. We held that if it were arbitrable, to that extent the contract would be unenforceable as in violation of public policy. We further acknowledged that *New Jersey Turnpike Authority v. Parsons,* 3 *N.J.* 235, 69 *A.*2d 875 (1949), had held that the Authority is a corporate entity independent of the State; but found it significant that that case turned on an analysis of the nature and activities of the Authority (as

distinguished from its employees) in the light of the problem involved, "to wit the responsibility *vel non* of the State for its debts." The *Parsons* case was distinguished, since the law there projected was intended to speak to the privileges and obligations of governmental agencies or authorities, rather than the privileges and obligations of employees of government.

■ The Authority is also a public entity subject to the Tort Claims Act. *S.E.W. Friel Company v. N.J. Turnpike Authority,* 73 *N.J.* 107, 373 *A.*2d 364 (1977).[2] Additionally, where the Legislature intends to have a public entity, such as the Authority, treated as a private corporation, it has so provided. *See Lieberman v. Port Authority,* 132 *N.J.* 76, 83–84, 622 *A.*2d 1295 (1993).

■ In view of the foregoing, we are unpersuaded by the following contentions of the union:

(1) The statutory power of the Authority to enter into contracts necessary, incidental or convenient to its operations, gives it the power to enter into labor contracts, without regard to the Act and its judicial construction; that its discretion in this area should not be interfered with, absent bad faith, fraud, corruption, oppression or palpable abuse, which are not present here (citing *City of Newark v. New Jersey Turnpike Authority,* 7 *N.J.* 377, 381–382, 81 *A.*2d 705, appeal dismissed 342 *U.S.* 874, 72 *S.Ct.* 168, 96 *L.Ed.* 657 (1951));[3] and that it has express authority to appoint such

---

[2] We note that coverage by the Tort Claims Act does not necessarily mean that the Authority is *fully* subject to the Employer/Employee Relations Act. Compare *Matter of N.J. Transit Bus Operations, Inc.,* 125 *N.J.* 41, 592 *A.*2d 547 (1991) with *Ross v. Transport of New Jersey,* 114 *N.J.* 132, 145, 553 *A.*2d 12 (1989). The first case is discussed below.

[3] This contention overlooks the statement in the cited case that the Authority is an "independent public corporation ... created to carry out legitimate and important functions of government ... [a] body both corporate and politic," 7 *N.J.* at 281, 81 *A.*2d 492. The Court also emphasized that "the discretionary power of a body charged with highway construction is [not] ... absolute" but must be exercised reasonably, just as any governmental body exercising police powers. *Id.* at 383, 81 *A.*2d 705.

employees as may be necessary in its judgment, and to promote and discharge them, all without regard to the Civil Service Act.

(2) Nothing in the Turnpike statute suggests it is not free to exercise its discretion to enter into employment contracts "across the table in the context of collective negotiations for a new contract." In creating the Authority, the Legislature had in mind a very different model of labor relations from that which prevails throughout the rest of State government. The model chosen by the Legislature is akin to "privatization" in many respects. The managers were given the freedom to act like private sector managers, free from ordinary government rules and free to make those agreements that they think best for the operation of the road. This freedom of contract was explicitly made to include labor relations and is an expression of government policy upon which *State Supervisory, supra,* requires that PERC and courts must lightly tread. The union relies in this respect on the *Matter of New Jersey Transit Bus Operations, Inc.,* 125 *N.J.* 41, 592 *A.*2d 547 (1991), discussed hereafter:

(3) The governmental purpose of the Authority, by the terms of its statute, is the extremely limited one of efficiently building, operating and maintaining the New Jersey Turnpike and to pay for its work through the collection of tolls; and, in so doing, it is to have virtually "unbridled" discretion in decision-making in all areas within the orbit of its statutory authority, including labor relations. It is not its governmental purpose to execute the wide array of "police powers" that inhere in state and local government. Thus, scope decisions made in other public employment contexts, including those regarding layoffs, are of only limited utility in assessing the proper scope of Authority negotiations, since the governmental interests and policies at stake in other governmental entities, such as education, are fundamentally different from those of the Authority.

(4) The nature of the discretion given to the Authority includes the discretion to enter into contracts necessary or incidental to the execution of its powers. One of its powers is the

power to set terms and conditions of employment. *N.J.S.A.* 27:23–5(m). Nothing in the statute suggests that the Authority is not free to exercise its discretion in the area of layoffs by reaching an agreement with a collective negotiations representative and formalizing that agreement in an enforceable contract. PERC's holding below violates this significant governmental policy, by depriving the Authority of the power to exercise its discretion in labor relations through the vehicle of collective negotiations.

█ We find these contentions to be at odds with the basic purpose of the Employer–Employee Relations Act. That act, rather than the Turnpike statute, governs where there may be a conflict as to the limitations on the scope of negotiations of provisions of an employment agreement. In this respect the Authority, despite the statute creating it, is no different from any other governmental agency. The governmental policy to be enforced under the Act is to have essentially like treatment for all governmental employers and employees. It is designed "to produce stability and further the public interest in efficiency in public employment." *Bd. of Ed. of Woodstown–Pilesgrove v. Woodstown–Pilesgrove Ed. Assn.,* 81 *N.J.* 582, 591, 410 *A.*2d 1131 (1980). This policy applies to the Authority and its employees, just as it does to other governmental entities.

Reliance by the union on *Matter of New Jersey Transit Bus Operations, supra,* 125 *N.J.* 41, 592 *A.*2d 547 (1991), is plainly misplaced. That case involved the unique situation of a private enterprise and its employees converting to the public sector, by virtue of federal and state legislation. There, PERC's decision to treat New Jersey Transit (NJT) employees differently from other public employees with regard to scope of negotiations was upheld by the Court. The Court emphasized that NJT employees were clearly different from other public employees, since "NJT employees were never public employees; they began their employment in the private sector and were assured [by the legislation and its history] . . . that their private sector labor rights would be retained after NJT's takeover" and its going public. *Id.* at 57, 59,

592 *A.*2d 547. The Court further stated that the legislation there involved completely eliminated the governmental management prerogative of the Employer–Employee Public Relations Act. *Id.* at 57, 59, 592 *A.*2d 547.

Unlike the employees in *New Jersey Transit,* neither the Authority nor its employees were ever part of the private sector. Furthermore, there is no legislative history indicating that the Authority's employees should be accorded the private sector bargaining rights assured by the Legislature in making New Jersey Transit a public body. Here, unlike *New Jersey Transit,* there is no basis in the Turnpike statute for concluding that the Authority should be treated differently, with respect to scope of negotiations, from other public employers in order to further any peculiar statutory mission. The Turnpike's "statutory mission" with respect to negotiations with its employees is no different essentially from that of any other governmental agency.

█ The fact that the non-negotiable layoff provision has been in the Authority's labor contracts for twenty-five years does not affect the result that PERC and we have reached. *Paterson Police PBA v. Paterson,* 87 *N.J.* 78, 87, 432 *A.*2d 847 (1981); *Ridgefield Park Ed. Assoc. v. Ridgefield Park Bd. of Ed.,* 78 *N.J.* 144, 162, 393 *A.*2d 278 (1978). The Authority's labor contracts cannot be equated with other contracts it makes, in light of the Act.

We add that the union's concern, expressed at oral argument, about a decision to subcontract work, which is non-negotiable, *In re IFPTE Local 195 v. State, supra,* 88 *N.J.* at 419, 443 *A.*2d 187 (1982), may well be a concern for employees of all public agencies.

The order of the PERC is affirmed to the extent that it holds layoff decisions by the Authority to be non-negotiable.